UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
PRISCILLA JIBOWU, individually and on
behalf of all other persons similarly situated,

                    Plaintiff,                          **MEMORANDUM & ORDER**
                                                        17-CV-3875 (PKC) (CLP)

          - against -

TARGET CORPORATION and TARGET
CORPORATION OF MINNESOTA,

                    Defendants.

------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

       Plaintiff Priscilla Jibowu ("Plaintiff"), individually and on behalf of all other persons

similarly situated, brings this putative collective action under the Fair Labor Standards Act

("FLSA") against Defendants Target Corporation and Target Corporation of Minnesota, alleging

overtime violations pursuant to the FLSA, New York Labor Law ("NYLL"), Illinois Minimum

Wage Law ("IMWL"), and Illinois Wage Payment and Collection Act ("IWPCA"). Before the

Court are Defendant Target Corporation's motion for summary judgment and Plaintiffs' motion

for conditional certification of a FLSA collective action.[1] For the reasons set forth below,

Defendant's motion for summary judgment is granted in part and denied in part, and Plaintiffs'

motion for conditional certification is granted subject to the limitations set forth in this

Memorandum and Order.

---

[1] As discussed *infra*, the motion for conditional certification is brought by Plaintiff Jibowu and seven opt-in Plaintiffs.

# BACKGROUND[2]

## I.    Target's Executive Team Leaders

Defendant Target Corporation ("Defendant" or "Target") is a national retailer with approximately 1,800 stores total and with stores in each of the 50 states. (Defendant's Rule 56.1 Statement ("Def.'s 56.1"),[3] Dkt. 86-2, ¶ 1.) Some of these stores have annual sales volumes exceeding $100 million and workforces as large as several hundred employees.  (*Id.* ¶ 2.) Each Target store has two salaried managerial positions: the senior-most Store Team Leader ("STL"), and some number of Executive Team Leaders ("ETLs").  (*Id.* ¶¶ 3–4.) At the time Plaintiff worked for Target, ETLs were staffed in departments such as Sales Floor—divided into Softlines and Hardlines in large-volume stores—Guest Services, Food Services, Logistics, and Replenishment. (*Id.* ¶ 5.)  Target stores also employ "team leaders" and "team members," positions that are classified as non-exempt and paid on an hourly basis. (*Id.* ¶ 10.) Target classifies ETLs as exempt executives/administrators  for purposes of the FLSA and state labor laws. (*See id.* ¶ 11.)

---

[2] In this section, the Court draws exclusively  from the evidence submitted  with Defendant's summary  judgment  motion (Dkt. 86).

[3] Unless  otherwise  noted,  a standalone  citation  to a party's 56.1 statement  denotes that the Court has deemed the underlying  factual allegation undisputed.  Any citation  to a 56.1 statement incorporates  by reference  the documents  cited therein;  where relevant,  however,  the Court may cite directly  to an underlying  document.  The Court has deemed facts averred  in a party's 56.1 statement  to which  the opposing party cites no admissible  evidence  in rebuttal  as undisputed.  *See* *Lumbermens  Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("Eastern  District Local Rule 56.1 requires . . . that disputed  facts be *specifically* controverted  by admissible  evidence.  Mere denial  of an opposing  party's statement  or denial  by general  reference  to an exhibit  or affidavit  does not specifically  controvert  anything." (emphasis  in original)).  Additionally,  to the extent a party's 56.1 statement  "improperly  interjects arguments  and/or immaterial  facts in response to facts asserted by [the opposing  party], without specifically  controverting  those facts," the Court has disregarded the statement.  *Risco v. McHugh*, 868 F. Supp. 2d 75, 86 n.2 (S.D.N.Y. 2012).

Upon hire or promotion to the ETL role, ETLs undergo six weeks of "Business College," which includes classroom and in-store training in leadership and management. (*Id.* ¶¶ 20–23.) As part of Business College, ETLs take wage-and-hour compliance training to reinforce the expectation that they do not spend more than half of their time on nonexempt, hourly tasks. (*Id.* ¶ 24.) After Business College, ETLs undergo twelve weeks of in-store training specific to their positions. (*Id.* ¶ 25.)

Target's job descriptions for the various ETL roles convey the expectation that ETLs spend the majority of their time on managerial duties. (*Id.* ¶ 26.) ETL duties are also generally summarized in Target's Exempt Team Member Handbook (the "Handbook"), which states that exempt employees are required to spend more than half of their time on managerial duties. (*Id.* ¶¶ 14–15; *see also* Handbook, Dkts. 86-12, 86-13, 86-14.) The Handbook also notes that exempt employees may "assist with hourly tasks on occasion," including "Zoning; Stocking; Cashiering; Unloading trailers, [and] moving boxes." (Def.'s 56.1, Dkt. 86-2, ¶¶ 16, 19.) In additional to their regular responsibilities, ETLs also work several shifts each week as their store's Leader on Duty ("LOD"), in which capacity they have additional oversight and managerial responsibilities over the entire store. (*See id.* ¶¶ 34–46.)

Target conducts annual performance reviews of its employees in its regular course of business. (*Id.* ¶ 48.) An ETL's annual review is conducted by their direct supervisor, who meets with the ETL to discuss the assessment. (*Id.* ¶ 50.) Since the mid-2000s, Target separately has conducted semi-annual or annual self-audits in order to determine whether ETLs spend more than half of their time on managerial duties. (*Id.* ¶ 53.)

## II.       Plaintiff Jibowu's Employment at Target

Plaintiff Jibowu began her employment at Target in July 2010 at a store in Wilson Yard, Chicago, where she worked as a guest services team member and then a human resources team leader. (Deposition of Priscilla Jibowu ("Jibowu Dep."), Dkt. 100-1, at 28:9–19.) Plaintiff worked at the Wilson Yard store for almost two years (*id.* at 27:22–28:1), after which she worked at another Target store in Chicago, located on State Street, from 2012 to the end of 2013 (*id.* at 29:25–30:9). On or around January 2014, Plaintiff was promoted to the position of ETL Replenishment when she transferred from the State Street store to a store in the West Loop neighborhood of Chicago. (Def.'s 56.1, Dkt. 86-2, ¶ 65; Jibowu Dep., Dkt. 100-1 at 30:15–31:1.) When she was promoted, Plaintiff underwent six weeks of training during which she shadowed another ETL. (Def.'s 56.1, Dkt. 86-2, ¶ 66; Jibowu Dep., Dkt. 100-1, at 149:11–25.) Plaintiff next worked as an ETL Replenishment in a Target store in South Loop, Chicago, for approximately two years. (Jibowu Dep., Dkt. 100-1, at 31:5–13.) Plaintiff also had temporary assignments at Chicago-area Target stores in Evanston and Near North. (*Id.* at 31:14–25.) In August 2016, Plaintiff moved to Brooklyn, New York, where she worked as an ETL Sales Floor at Target's Brooklyn locations in Flatbush, Atlantic Terminal, and Gateway. (*Id.* at 35:22–37:14.) Plaintiff quit her employment at Target on or around October 20, 2017 in order to develop her career elsewhere. (*Id.* at 196:15–20, 200:20–24.)

## III.      Relevant Procedural History

Plaintiff commenced the instant action on June 28, 2017 (*see* Complaint ("Compl."), Dkt. 1), and Defendants answered on August 7, 2017 (Dkt. 13). On April 19, 2019, Defendant Target requested a pre-motion conference on its anticipated motion for summary judgment. (Dkt. 67.)

On May 22, 2019, the Court held a pre-motion conference and set a briefing schedule[4] both for Plaintiffs' motion for conditional certification of a FLSA collective action and Defendant's motion for summary judgment. (May 22, 2019 Minute Entry.) Defendant's motion for summary judgment was fully briefed on September 6, 2019 (Dkts. 86, 88, 89), and Plaintiffs' motion for conditional certification was fully briefed on September 10, 2019 (Dkts. 79, 91, 92).

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.    Legal Standard

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (noting that summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). A dispute of a material fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The initial "burden of establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Once this burden is met, however, the burden shifts to the non-moving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009) (citations omitted); *see also Celotex Corp.*, 477 U.S. at 322–23. A

---

[4] The Court also scheduled oral argument on Defendant's motion, pursuant to the Court's Individual Rule that automatically grants oral argument to attorneys with five or fewer years of post-law school experience, but cancelled that argument when the attorney who had fewer than five years of post-law school experience and was to argue the motion for Defendant was no longer available. (*See* Nov. 18, 2019 Order.)

mere "scintilla of evidence" in support of the non-moving party is insufficient; rather, "there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (alteration in original) (quoting *Anderson*, 477 U.S. at 252). In other words, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (internal quotation and emphasis omitted).

When assessing whether a genuine issue of fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008) (citing *Anderson*, 477 U.S. at 255). The Court also construes any disputed facts "in the light most favorable to the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48 (emphasis omitted).

## II.     Executive Exemption to Overtime Pay

Defendant Target moves for summary judgment on Plaintiff Jibowu's FLSA, NYLL, and IMWL overtime claims, arguing that there is no genuine dispute that Plaintiff's ETL roles fell within the *bona fide* executive exemption to overtime pay and that she was properly compensated for the hours she worked above forty per week. (Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment ("Def.'s Mem."), Dkt. 86-1, at 11–24.) Plaintiff maintains that genuine issues of material fact preclude summary judgment on executive exemption grounds, as the actual job duties she undertook as an ETL do not meet the regulatory requirements for the executive exemption under the FLSA, NYLL, and IMWL. (Plaintiff's Memorandum of Law in Opposition ("Pl.'s Opp'n"), Dkt. 88, at 11–29.)

## A.     The FLSA and Relevant State Law

The FLSA generally provides that "[e]very employer shall pay to each of his employees" a minimum wage, 29 U.S.C. § 206(a), and that an employer shall not "employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for [her] employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which [s]he is employed," *id.* § 207(a)(1). Exempted from the FLSA overtime pay requirement is "any employee employed in a bona fide executive, administrative, or professional capacity." *Id.* § 213(a)(1).

Pursuant to Department of Labor ("DOL") regulations, "[t]he exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations" that define executive employees. 29 C.F.R. § 541.2. These requirements are as follows: (1) the employee is compensated no less than $455 per week[5]; (2) the employee's "primary duty is management"; (3) the employee "customarily and regularly directs the work of two or more other employees;" and (4) the employee has the authority to hire or fire, or her suggestions and recommendations regarding hiring or firing are given "particular weight." *Id.* § 541.100. The employer "bears the burden to establish the applicability of an exemption under the FLSA." *Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219, 227 (2d Cir. 2018) (citing *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 204 (2d Cir. 2009)). These overtime exemptions are given a "fair reading" in recognition that they "are 'as much a part of the FLSA's

_____

[5] As of January 1, 2020, this amount has been adjusted upwards to $684 per week. *See* 29 C.F.R. § 541.100(a)(1). However, the Court uses the prevailing rate at the time of Plaintiff's employment. *See Panora v. Deenora Corp*, __ F. Supp. 3d __, 2020 WL 3165183, at *2 n.3 (E.D.N.Y. 2020). The parties agree that Plaintiff was compensated more than $455 per week during her employment as an ETL. (*See* Def.'s Mem., Dkt. 86-1, at 12–13; Pl.'s Opp'n, Dkt. 88, at 11.)

purpose as the overtime-pay requirement.'" *Id.* at 228 (quoting *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018)).[6]

Summary judgment is appropriate on an executive exemption claim when all four above requirements are satisfied. *See Karropoulos v. Soup du Jour, Ltd.*, 128 F. Supp. 3d 518, 535 (E.D.N.Y. 2015) (citing *Stevens v. HMSHost Corp.*, No. 10-CV-3571 (ILG) (VVP), 2015 WL 4645734, at *6 (E.D.N.Y. Aug. 5, 2015)). Thus, at the summary judgment stage, Defendant Target must show that there are no genuine issues of material fact as to each requirement. *See id.*

> The exemption question under the FLSA is a mixed question of law and fact. The question of how the employees spent their working time is a question of fact. The question of whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law.

*Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 511 (2d Cir. 2020) (quoting *Pippins v. KPMG, LLP*, 759 F.3d 235, 239 (2d Cir. 2014)).

The relevant state law provisions in Illinois and New York closely track the FLSA requirements for those employees properly classified as *bona fide* executives. *See* 820 Ill. Comp. Stat. 105/4a(2)(E) (incorporating the FLSA's exemption for *bona fide* executive employees); N.Y. Lab. L. § 651(5)(c) (same); *see also Callahan v. City of Chicago*, 78 F. Supp. 3d 791, 821 (N.D. Ill. 2015) ("Because the IMWL parallels the FLSA so closely, courts have generally interpreted their provisions to be coextensive, and so have generally applied the same analysis to both." (citations omitted)); *Clougher v. Home Depot U.S.A., Inc.*, 696 F. Supp. 2d 285, 289 n.5 (E.D.N.Y.

---

[6] In its reply memorandum, Defendant argues that Plaintiff "relies on the wrong legal standard for assessing an exemption under the FLSA" because "nearly all of [Plaintiff]'s cited authorities denying summary judgment pre-date *Encino Motorcars*, and place a much heavier burden on the movant-employer than is now permitted by narrowly construing the exemptions." (Defendant's Reply Memorandum of Law in Support of Its Motion for Summary Judgment ("Def.'s Reply"), Dkt. 89, at 3 n.5 (collecting cases cited by Plaintiff).) The Court acknowledges the applicability of the *Encino Motorcars* standard, but does not agree that the pre-*Encino Motorcar* authorities cited by Plaintiff would necessarily have reached a different outcome under the new standard. The Court thus cites to prior case law as relevant to its analysis.

2010) ("[F]ederal courts evaluate New York's executive exemption by reference to the [FLSA] and its attendant regulations." (citations omitted)).

## B. Analysis

Plaintiff argues that Defendant has failed to meet its burden as to the second, third, and fourth requirements of the executive exemption test. (Pl.'s Opp'n, Dkt. 88, at 11.) The Court considers each requirement in turn, bearing in mind that an employee's exempt status "does not depend on an employee's general characterization of his or her job . . . . What is important is what an employee actually does on a day-to-day basis." *Perkins v. S. New Eng. Tel. Co.*, 669 F. Supp. 2d 212, 219 n.3 (D. Conn. 2009) (internal quotation omitted); *see also Martinez v. Hilton Hotels Corp.*, 930 F. Supp. 2d 508, 525 n.16 (S.D.N.Y. 2013) ("[T]he determination of whether or not an employee qualifies as exempt under the regulations focuses on evidence regarding the actual day-to-day activities of the employee rather than more general job descriptions contained in resumes, position descriptions, and performance evaluations[.]" (internal quotation and alterations omitted)).[7]

### 1. "Primary Duty" of "Management"

The second factor of the FLSA executive exemption test requires that an employee's "primary duty" be "management." 29 C.F.R. § 541.100(a)(2). The DOL regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs." *Id.* § 541.700(a). The regulations define "management" as including, but not limited to,

> activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees;

---

[7] The Court accordingly does not credit Defendant's line of argument that Plaintiff's duties were primarily managerial because they were described as such in her official position description or on her resume. (*See* Def.'s Mem., Dkt. 86-1, at 14; Jibowu Dep., Dkt. 100-1, at 103:5–25 (noting that Plaintiff's description of ETL-Sales Floor position on her resume "follows the job description that was laid down by Target Corporation").)

maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

*Id.* § 541.102. In determining whether an employee's primary duty is management, the regulations also note that courts should consider factors including, but not limited to,

the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.* § 541.700(a); *see also Mullins v. City of New York*, 653 F.3d 104, 107 (2d Cir. 2011). While the amount of time that an employee spends performing managerial work does not alone determine whether such work is their primary duty, *see Paganas v. Total Maint. Sol., LLC*, 726 F. App'x 851, 853–54 (2d Cir. 2018) (summary order) (citations omitted), "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement," 29 C.F.R. § 541.700(b). Furthermore, "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." *Id.*; *see also Carhuapoma v. N.Y.-Presbyterian Healthcare Sys., Inc.*, No. 11-CV-8670 (JPO) (RLE), 2013 WL 1285295, at *9 (S.D.N.Y. Mar. 29, 2013) (noting that exempt executives have discretion in deciding when to perform non-managerial duties). Ultimately, the DOL regulations provide that the "primary duty" analysis must consider "all the facts in a particular case." 29 C.F.R. § 541.700(a). "Many courts have held that resolving this difficult and intensive factual inquiry is inappropriate at summary judgment." *Indergit v. Rite*

*Aid Corp.*, Nos. 08-CV-9361 (PGG), 08-CV-11364 (PGG), 2010 WL 1327242, at *6 (S.D.N.Y. Mar. 31, 2010) (collecting cases).

The DOL regulations also specifically address the exempt classification of "assistant managers in a retail establishment," who "may have management as their primary duty even if [they] spend more than 50 percent of the time performing nonexempt work such as running the cash register." 29 C.F.R. § 541.700(c). This subsection notes that, "if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement." *Id.*; *see also Brown v. Barnes & Noble, Inc.* ("*Brown II*"), No. 16-CV-7333 (RA) (KHP), 2018 WL 3105068, at *10 (S.D.N.Y. June 25, 2018) ("[A]pplicable regulations and case law, including from the Second Circuit, make clear that the amount of time a manager in a retail setting spends on non-exempt tasks is not very meaningful in determining the manager's primary duty.").

Defendant argues that Plaintiff's primary duty in both of her ETL roles was to manage the team members in her department, that she "was responsible for running the business of her department," and that she otherwise conducted management responsibilities as her primary duty within the meaning of the regulations. (Def.'s Mem., Dkt. 86-1, at 13.) Plaintiff counters that this issue is disputed in light of Plaintiff's deposition testimony and other evidence indicating that, in practice, she had few if any management responsibilities and little managerial authority as an ETL. (Pl.'s Opp'n, Dkt. 88, at 12–13.) Despite the significant volume of evidence Defendant proffers in support of its position, the Court finds that there remain material facts in dispute as to whether Plaintiff's primary duty as an ETL was, in fact, management.

Defendant has adduced two principal forms of evidence. First, Plaintiff's own statements, in the form of self-assessments and email communications, indicate that she performed

management responsibilities throughout her employment with Target. Plaintiff's 2015 Annual Performance Review includes a self-assessment in which Plaintiff described having "manage[ed] talent," "taught and trained a new ad team," "[p]romoted" various employees to team leads, and helped train various team members. (Declaration of Sara Tomezsko ("Tomezsko Decl."), Target's Request for Admissions ("RFA")[8] Ex. A, Dkt. 97-12, at ECF[9] 26.) In another 2015 self-assessment, Plaintiff reported that she "promoted 2 new [perishables department assistants]," was "training more team member[s]," was "captaining the signing team overnight to ensure an effective ad process," and had "captained the inventory team to help set up [the] back room." (*Id.* Ex. T, Dkt. 97-14, at ECF 25–26.) In her 2016 Annual Performance Review, Plaintiff's self-assessment described how she "[p]romoted" team members to team leader positions, "executed [a] weekly schedule for [her] team," "acquired the appropriate amount of staff to work through 4th quarter ramp up," and "on-boarded" a team leader.[10] (*Id.* Ex. B, Dkt. 97-12, at ECF 30–31.) Plaintiff also noted in this self-assessment that she "[m]aintained" various food- and ad-related processes, "[d]eveloped" and "set up routines," "executed" team schedules, and "staffed the team." (*Id.*) Plaintiff completed another self-assessment as part of a 2017 Performance Category Check-In, in

---

[8] To the extent either party disputes that this evidence is inadmissible under the Federal Rules of Evidence, "[i]n general, even if evidence is not properly authenticated at the summary judgment stage, so long as evidence will be presented in admissible form at trial, it may be considered on summary judgment." *Hill v. County of Montgomery*, No. 14-CV-933 (BKS) (DJS), 2019 WL 5842822, at *10 (N.D.N.Y. Nov. 7, 2019) (internal quotation and citations omitted).

[9] Citations to ECF refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[10] The STL stated in a sworn declaration submitted as part of Defendant's summary judgment briefing that he "did not tell [Plaintiff] what to say in her performance self-assessment." (Declaration of Calvin Islar, ("Islar Decl."), Dkt. 86-18, ¶ 29.)

which she noted that she promoted an employee to team lead and held status meetings with team leaders. (*Id.* Ex. C, Dkt. 97-12, at ECF 35–36.)

In separate communications, Plaintiff described by e-mail to her STL that she "started to move the team around in different areas," "dug into talent management to help with team engagement," and "worked on [the] scheduling process ensuring . . . the right team on the right night." (*Id.* Ex. U, Dkt. 97-14, at ECF 28.) The record indicates that Plaintiff also authored performance reviews for her department team leaders (*id.* Ex. D, Dkt. 97-12, at ECF 39–40; *id.* Exs. E, F, Dkt. 97-13, at ECF 6–12); updated her colleagues about a team member who planned to leave, and stated that "[they] need[ed] to start training 2 new people" (*id.* Ex. G, Dkt. 97-13, at ECF 14); coordinated with the ETL Human Resources ("ETL HR") to discuss training circumstances for a new employee and a shift in hours for a second employee[11] (*id.* Ex. J, Dkt. 97-13, at ECF 21); monitored and discussed an employee's performance[12] (*id.* Ex. L, Dkt. 97-14, at ECF 2); emailed her team about enforcing attendance and documentation policies (*id.* Ex. M, Dkt. 97-14, at ECF 4–5); completed a "Confidential Corrective Action – Unacceptable Conduct" form for an employee (*id.* Ex. N, Dkt. 97-14, at ECF 8–9); completed "Performance Discussion Documentation" forms for a Brooklyn team leader who "fail[ed] to meet goal times" (*id.* Ex. O, Dkt. 97-14, at ECF 12–13) and four Chicago team leaders with various performance issues (*id.* Ex. K, Dkt. 97-13, at ECF 24–30); directed that communications about an employee's accident be sent to all overnight ETLs and the STL (*id.* Ex. P, Dkt. 97-14, at ECF 15–16); set priorities for and

---

[11] Plaintiff also wrote that she would "get [the second employee] additional days the following week." (*Id.* Ex. J, Dkt. 97-13, at ECF 21.)

[12] The record indicates that Plaintiff spoke to a colleague, Sue, seemingly to confirm that they could "go forward with [the employee's] term." (*Id.*) The Court assumes this refers to the possibility of termination.

gave directions to her Brooklyn team leaders (*see id.* Ex. Q, Dkt. 97-14, at ECF 18 (instructing team "to start getting more product out of the back and to the floor"); *id.* Ex. R, Dkt. 97-14, at ECF 20 (mapping out for her team leaders a "non-negotiable" two-night "Game Plan" with various tasks)); and planned to sit in on all team member reviews when her team leaders were new to their positions (*id.* Ex. S, Dkt. 97-14, at ECF 22).

Second, Defendant has supplied declarations from various Target employees who worked with Plaintiff in her ETL roles. Mike Gustafson, the STL at the Chicago South Loop store, supervised Plaintiff when she was an ETL Replenishment at that location from early 2014 through August 2016. (Declaration of Michael Gustafson ("Gustafson Decl."), Dkt. 86-17, ¶ 4.) STL Gustafson stated that he conveyed to Plaintiff an expectation "to spend 90% of her time on her managerial duties, and approximately 10% of her time jumping in to help her team get something done."[13] (*Id.* ¶ 10.) According to STL Gustafson, Plaintiff supervised the unloading, sorting, and grouping of merchandise (*id.* ¶ 15), decided "which and how many team members" would be responsible for each task in the restocking process, supervised team members, and gave team members feedback "based on her own observations of their performance" (*id.* ¶ 17; *see also id.* ¶ 20 (describing that Plaintiff provided "coaching and mentoring to her team")). STL Gustafson also "gave [Plaintiff] the autonomy to decide how to meet [Target's] expectations through the leveraging of people and resources" (*id.* ¶ 13), which involved the responsibility to schedule team members and manage certain planning processes (*id.* ¶¶ 26–27). STL Gustafson emphasized that Plaintiff "had discretion to prioritize tasks" over his recommendation (*id.* ¶ 18) and "did not need

---

[13] STL Gustafson separately noted that he initially "encouraged [Plaintiff] to spend some time performing non-managerial work alongside her team members" in order to improve her relationship with them. (Gustafson Decl., Dkt. 86-17, ¶ 22.)

[his] permission to direct employees, discipline employees, or change her strategy during a shift" (*id.* ¶ 28).

In addition to STL Gustafson, Plaintiff "report[ed] to" Anthony Pilla, who worked as the ETL Logistics at the Chicago South Loop store with Plaintiff from 2015 to August 2016. (Declaration of Anthony Pilla ("Pilla Decl."), Dkt. 86-23, ¶¶ 3–4.) Pilla stated that, when Plaintiff was an ETL Replenishment, she "directly supervised" members of the flow, instocks, backroom, presentation, and signing teams by "monitoring her team's progress throughout the shift, and following up with them to make sure they were completing their tasks on time and according to Target's brand standards." (*Id.* ¶¶ 6–7.) Pilla noted that he "gave [Plaintiff] a significant amount of autonomy to oversee her team," which she exercised by developing plans to streamline certain signing and backroom processes. (*Id.* ¶¶ 13–15.) Pilla also explained that Plaintiff completed performance reviews for team members and team leaders (*id.* ¶ 26), and could discipline or coach employees without his approval (*id.* ¶ 28; *see also id.* Ex. 1, Dkt. 86-24; *id.* Ex. 2, Dkt. 86-25.).

Calvin Islar was the STL at the Brooklyn Gateway store, where he supervised Plaintiff from August 2016 through October 2017. (Declaration of Calvin Islar ("Islar Decl."), Dkt. 86-18, ¶ 3.) According to STL Islar, "[Plaintiff]'s primary objective as an ETL–Sales Floor was to make sure that her department was running smoothly by acting as its business owner" (*id.* ¶ 7), and she was given "a substantial amount of autonomy to complete the tasks in her department"[14] (*id.* ¶ 12). For example, Plaintiff "was responsible for monitoring various performance indicators," "making

---

[14] Additional purported examples of Plaintiff's autonomy submitted with the Islar Declaration include an email from Plaintiff to her team in which she directs them, *inter alia*, to make sure their "areas look good and stay good" (Islar Decl. Ex. 1, Dkt. 86-19); an email in which Plaintiff outlines her "2 Night Game Plan" of various tasks for team members (*id.* Ex. 2, Dkt. 86-20); and an email from Plaintiff instructing team members as to the scheduling and performance of weekly "Brand walks" (*id.* Ex. 3, Dkt. 86-21).

sure she had enough team members in the store to complete the work" (*id.* ¶ 8), and "translating the information discussed at [planning] meetings into actionable goals and tasks for her team members to complete" (*id.* ¶ 10). Plaintiff also "was involved in the process of completing and administering annual reviews for team members and team leaders," a process that involved multiple ETLs and the STL, as "team members might work with multiple ETLs throughout the week, and it was important for all ETLs who supervised that team member to know where he or she stood in terms of performance." (*Id.* ¶ 25.) According to STL Islar, Plaintiff was also "involved in the process of identifying and preparing team members and team leaders for promotion." (*Id.* ¶ 28.)

Desiree Roberts was an ETL HR who worked with Plaintiff at the Brooklyn Gateway store from August 2016 until October 2017. (Declaration of Desiree Roberts ("Roberts Decl."), Dkt. 86-26, ¶ 3.) In addition to observations like those discussed by Plaintiff's other colleagues, Roberts stated that she "observed [Plaintiff] on the sales floor . . . leading and directing her team members to execute tasks in her department"[15] (*id.* ¶ 6), and that Plaintiff was "involved in assessing her team members' and team leaders' performance through the annual review process" (*id.* ¶ 18). This process involved "calibration meeting[s]" at which Plaintiff recommended ratings for particular team members or team leaders, and at which, according to Roberts, Plaintiff's recommendations were followed "a majority of the time." (*Id.* ¶¶ 19–20.)

Alvin Gangaram was a team leader who reported to Plaintiff when she was an ETL Sales Floor at the Brooklyn Gateway store. (Declaration of Alvin Gangaram ("Gangaram Decl."), Dkt. 86-16, ¶¶ 2–3.) Gangaram stated, *inter alia*, that Plaintiff reviewed weekly tasks with team leaders,

_____

[15] Notably, ETL HR Roberts "spen[t] approximately 80% of each of [her] shifts working in [her] office, and about 20% of the shift on the sales floor." (Roberts Decl., Dkt. 86-26, ¶ 5.) She thus would only have observed Plaintiff working for some fraction of the time.

inquired after the professional development of team members, and gave instructions for team leaders to relay to their teams. (*Id.* ¶¶ 9–10.)

The Court next further examines the record evidence[16] in light of the factors relevant to the primary duty analysis as outlined by the DOL regulations and the contrary evidence adduced by Plaintiff. *See* 29 C.F.R. § 541.700(a); *Mullins*, 653 F.3d at 107.

### a. Relative importance of exempt versus non-exempt work

The official description of the ETL position in the Handbook states that ETLs "are responsible for achieving [their] responsibilities through effective management and supervision so that [they] meet these expectations." (Def.'s 56.1, Dkt. 86-2, ¶ 17.) Plaintiff's self-assessments, annual reviews, and the declarations of both her colleagues and supervisors also note the importance of Plaintiff's managerial duties. (*See, e.g.*, Islar Decl., Dkt. 86-18, ¶ 18 ("It was critical that [Plaintiff] hold her [Brooklyn] team members accountable and make sure they completed the work assigned to them."); Gustafson Decl., Dkt. 86-17, ¶¶ 5–6 ("The ETL-Replenishment manages a team of team members and team leaders . . . [Plaintiff]'s role as ETL-Replenishment was critical to the successful operation of Chicago South Loop.").)

In contrast, Plaintiff's impression was that her managerial duties were of relatively less importance to Defendant as compared to her nonmanagerial duties. In Plaintiff's view, "[t]he most important thing [was] to make sure that the floor [wa]s full and stocked and ready for sales."

---

[16] In addition to the evidence discussed *supra*, Defendant has also submitted text message conversations between Plaintiff and various colleagues. (*See* Tomezsko Decl., RFA Ex. 4, Dkt. 86-33.) While these conversations show Plaintiff communicating with and scheduling team members (*see, e.g., id.* at ECF 2 (asking Preston whether he can close instead of open)), they also show Plaintiff obtaining approval from her supervisors in order to make staffing decisions (*see, e.g., id.* at ECF 4 (confirming with STL Calvin Islar that he approved an employee to work overtime hours)). The Court does not find that they conclusively resolve any of the disputed material facts discussed *infra*.

(Jibowu Dep., Dkt. 100-1, at 205:4–6; *see also id.* at 218:10–18 (explaining that her "key function" as an ETL Sales Floor was to keep her area well-stocked, clean, zoned, and ready for guests to shop).) For example, Plaintiff testified that no one at Defendant's New York stores instructed her to spend more than half of her time on managerial duties. (*Id.* at 189:4–7.) Plaintiff also could not recall being told about the management activities expected of her as an ETL. (*Id.* at 157:11–158:22.) Plaintiff additionally did not perceive that her supervision of team members was necessary, since they generally "knew what was expected of them." (*Id.* at 220:7–221:14.) Furthermore, according to Plaintiff, Defendant cut resources for team members at the stores at which Plaintiff worked (*id.* at 186:11–187:7, 188:12–24; *see also id.* at 185:1–3 ("[T]here are times that they have actually called team members and had them not come in to save hours for the store.")),[17] thereby effectively requiring her to perform unfinished nonexempt tasks herself.

As evidenced by the declarations of her colleagues and supervisors, Plaintiff's managerial authority was also limited by other ETLs, further suggesting that Plaintiff's managerial duties were less important than her nonmanagerial duties. For example, ETL-Logistics Pilla sometimes directed Plaintiff to schedule her team members in a particular way. (*See* Pilla Decl., Dkt. 86-23, ¶ 22 (stating that "about 50% of the time" he would "let [Plaintiff] know how [he] would like [tasks] completed and which team members [he] thought should work on the project.").) As to scheduling, ETL-HR Roberts "was responsible . . . for drafting the store's schedules in the first instance" and "sought [Plaintiff's] input on what she wanted to schedule for her department." (Roberts Decl., Dkt. 86-26, ¶ 12 (noting, too, that Plaintiff could "move employees on the schedule" thereafter but needed an STL's approval if she "wanted to add employees to the

---

[17] Plaintiff estimated that the Brooklyn Gateway and Chicago South Loop Target stores had roughly the same number of executives and team members. (*Id.* at 192:23–194:4.)

schedule . . . [and] doing so would exceed payroll for that week").) Roberts also explained that she "partnered with [Plaintiff] . . . to go over any attendance issues with her department" (*id.* ¶ 13) and that, as part of the HR department, Roberts "was responsible for scheduling formal training," while Plaintiff "was responsible for developing her team members through [a] type of informal on-the-job training" (*id.* ¶ 14). With regard to training, Plaintiff testified that she played only a limited role in training her team, as "the team knew what they needed to do [because] they were already trained. Training and stuff is set up and handled by HR." (Jibowu Dep., Dkt. 100-1, at 224:19–21; *see also id.* at 234:15–17 ("I didn't develop a talented team. . . . I had a team that came into the store that was pretty much already trained.").)

With regard to discipline, the record shows that Plaintiff could recommend certain disciplinary measures but lacked the authority to actually mete out discipline. For example, STL Islar described that, "[a]s part of the process of holding team members accountable, [he] expected [Plaintiff] to recommend disciplinary action if she believed it was necessary, for instance, if someone was not showing up to work, performing their job in an unsatisfactory way, or violating store policy." (Islar Decl., Dkt. 86-18, ¶ 20.) ETL-HR Roberts described that she and Plaintiff "partnered . . . to issue and administer team member disciplinary action," and that Roberts "accepted [Plaintiff]'s recommendation to issue a formal discipline more than half the time, if not more frequently." (Roberts Decl., Dkt. 86-26, ¶ 15.) Roberts also reviewed disciplinary forms after Plaintiff completed them, and had the authority to make changes, although Roberts stated that she did not make changes "[a] majority of the time." (*Id.* ¶ 16.) Plaintiff testified that she did not have the authority as an ETL Replenishment or ETL Sales Floor to independently discipline employees. (Jibowu Dep., Dkt. 100-1, at 389:12–14, 395:6–8.)

With regard to staffing decisions, Plaintiff again had little independent authority. In Chicago, she went to STL Gustafson with requests to increase her labor budget. (Gustafson Decl., Dkt. 86-17, ¶ 32 (declaring that "[a]pproximately bi-monthly, [Plaintiff] spoke to [him] about labor budgets for payroll" and that he "almost always granted [her] requests to increase these budgets").) In Brooklyn, STL Islar declared that he "routinely consulted [Plaintiff] about the labor budget in her department," "always tried to give her the amount of labor hours she requested," and "discussed the possibility of hiring additional employees" with her if she thought her department was understaffed. (Islar Decl., Dkt. 86-18, ¶¶ 22–23; *see also* Pilla Decl., Dkt. 86-23, ¶ 12 ("With respect to [the] payroll and labor budget, the STL and I relied on [Plaintiff] to make recommendations on whether we should add team members to the schedule, cut hours from the schedule, or make other adjustments.").) Plaintiff testified that she could not set employee wages or the store labor budget, and that she lacked the authority both to determine labor hours for a store and to allocate labor hours in her assigned areas within a store. (Jibowu Dep., Dkt. 100-1, at 390:9–20, 395:25–396:13.) Plaintiff also testified that, as she did not have the authority to hire team members, she raised her concerns about needing more team members with her STL. (*Id.* at 159:13–21, 162:12–17; *see also id.* at 159:25–160:3 ("Whenever I needed more bodies or needed help, I went to the STL, that's what you're supposed to do because I'm not able to just have team members come in myself.").) In spite of this, Plaintiff testified that her teams were continually understaffed. (*Id.* at 163:22; *see also id.* at 392:6–14 ("The [Chicago] store was understaffed. . . . It was constant."), 397:5–12 (same at Brooklyn stores).)

Plaintiff similarly had the authority only to recommend, rather than implement, hiring decisions. ETL-HR Roberts described that Plaintiff "told [Roberts] when [Plaintiff] thought Target needed to hire additional people to work in her department, or whether she thought [they]

should post an opening for a position on her team," and that Roberts then "relied on [Plaintiff's] recommendation to schedule interviews for new hires or post a new opening a majority of the time." (Roberts Decl., Dkt. 86-26, ¶ 23.) The evidence also indicates that Plaintiff could not open a position but instead had to request from another colleague that a position be opened in order to commence interviews of potential candidates. (*See, e.g.*, Tomezsko Decl., RFA Ex. H, Dkt. 97-13, at ECF 16.)

Additionally, Plaintiff testified that her managerial communications largely consisted of relaying instructions or directives from other managers, or passing along information from Defendant as a corporate entity. (*See* Jibowu Dep., Dkt. 100-1, at 245:10–248:14, 249:20–251:11 (describing various aspects of her roles as "pass[ing] along information" given to her by Defendant); *id.* at 275:1–12 (characterizing her LOD communications as "passing along information" from "other leadership on the floor").) If found true by a jury, this fact in itself could undercut a finding that Plaintiff's primary duty was managerial. *See Stevens*, 2015 WL 4645734, at *5 (noting that it was "far from clear whether plaintiff's managerial obligations were truly important enough to his workplace to classify them as his primary duties" where plaintiff "stated that he was not empowered to make managerial decisions but merely functioned as a conduit for the directives of his supervisors").

The evidence that nonexempt team leaders appear to have done many of the same tasks as Plaintiff further weighs against a finding that Plaintiff's exempt duties were of greater relative importance to Defendant than her nonexempt duties. For example, team leaders normally conducted reviews of team members. (*See* Tomezsko Decl., RFA Ex. S, Dkt. 97-14, at ECF 22.) When an employee was "one of [Plaintiff]'s Team Leaders, [they] were expected to make the business decisions to run a department, which she delegated." (Gangaram Decl., Dkt. 86-16, ¶ 7.)

As a team leader, Gangaram provided Plaintiff with a list of "tasks [he] thought needed to be completed" (*id.* ¶ 8), told Plaintiff about "the professional development of Team Members [he] supervised including who could handle more responsibility and perhaps be promoted" (*id.* ¶ 9), and learned from Plaintiff "that part of being a leader was having your team work for you and using your team to get tasks done" (*id.* ¶ 11). According to ETL-HR Roberts, "[t]eam leaders worked directly under [Plaintiff] and helped her supervise the work of the team members responsible for executing tasks." (Roberts Decl., Dkt. 86-26, ¶ 10.) This evidence indicates that Plaintiff's managerial duties with respect to the team leaders closely mirrored the duties of nonexempt team leaders with respect to their nonexempt team members. *See Costello v. Home Depot USA, Inc.*, 928 F. Supp. 2d 473, 493 (D. Conn. Mar. 5, 2013) (finding that "a material issue of fact remain[ed] as to the relative importance of [plaintiff]'s managerial functions" given, *inter alia*, "divergent accounts of the amount of time actually spent on managerial tasks . . . , the degree to which those functions were replicated by lower-level employees, . . . and [plaintiff's] somewhat uncertain degree of influence in hiring decisions").

Accordingly, in light of the above, the Court finds that the evidence presents a disputed issue of material fact as to whether Plaintiff's managerial duties as an ETL Replenishment and ETL Sales Floor were relatively more important to Defendant than were her nonmanagerial duties.

b.    Amount of time spent performing exempt work

Plaintiff's testimony generally describes that, regardless of the Target store at which she worked, she spent the majority of her time performing nonmanagerial duties and observed the same trend among other ETLs. During her initial six-week training period in 2014, Plaintiff testified that she shadowed an ETL Logistics who spent at least seventy-five or eighty percent of his time on nonmanagerial duties, such as "stocking, cleaning up the floor, loading pallets, and

unloading the truck." (Jibowu Dep., Dkt. 100-1, at 149:11–25, 174:1–175:3.) Plaintiff recalled seeing similar behavior by other ETL-Logistics employees at the prior Target store at which she worked. (*Id.* at 176:5–8.) According to Plaintiff, the amount of time that she spent in each category of job duties was effectively the same when she transferred from her Chicago role to the ETL Sales Floor role upon her move to New York.[18] (*Id.* 35:14–37:17.) In Brooklyn, Plaintiff continued to work between fifty-five and sixty hours per week (*id.* at 372:7–22), spend between seventy-five to eighty percent of her time on nonmanagerial duties, and engage up to eighty-five or ninety percent of her time performing tasks such as "pushing a truck with the team" during periods when fewer team members were available (*id.* at 182:21–184:2).

Plaintiff also testified that, while Target directed ETLs to accomplish their goals through others, she was "continually understaffed" (*id.* at 163:22) and would perform hourly tasks herself because she did not have enough team members to accomplish the goals required of the ETL position (*see id.* at 157:3–6 ("[I]f you're not responsible for the staffing and you're not staffed with other people, due to the job[,] duties to get done are pretty much going to get done by yourself."); *id.* at 164:1–3 ("If you don't have the team members to do their job you end up doing their job for them."); *see also id.* at 185:1–3 ("[T]here are times that they have actually called team members and had them not come in to save hours for the store.")).[19] Throughout her time as an ETL,

---

[18] Plaintiff testified that, when she worked briefly at stores other than the Chicago South Loop and Brooklyn Gateway locations, she performed the same nonmanagerial duties. (*Id.* at 35:14–21.)

[19] Defendant's reliance in response on *Golden v. Merrill Lynch & Co., Inc.* is misplaced (*see* Def.'s Mem., Dkt. 86-1, at 21), as the plaintiff there testified that she performed nonexempt duties only "when her [u]nit was shorthanded or the volume of [work] was high" and that "this did not occur daily." *See* No. 06-CV-2970 (RWS), 2007 WL 4299443, at *14–15 (S.D.N.Y. Dec. 6, 2007). Here, the evidence suggests that Plaintiff Jibowu regularly performed nonexempt duties and did not merely "lend an 'extra hand' during high volume periods." *Id.* at *15 (quoting *Donovan v. Burger King*, 675 F.2d 516, 518 (2d Cir. 1982)).

Plaintiff felt that she spent more time on nonmanagerial tasks than she would have if she had more team members. (*Id.* at 166:11–16.) Plaintiff raised with the STL her concerns about needing hourly members for staffing purposes (*id.* at 159:13–160:9), but her requests to call in additional team members were usually denied (*id.* at 186:1–10). Notably, this testimony is not disputed by the declarations of Plaintiff's STLs, which convey that Plaintiff could not change labor hours. (*See* Gustafson Decl., Dkt. 86-17, ¶ 31 (noting that Plaintiff "did not need permission to call a team member into work, as long as it did not put that team member over 40 hours for that week"); Islar Decl., Dkt. 86-18, ¶¶ 22–23 (noting that he "always tried to give [Plaintiff] the amount of labor hours she requested" and that, "[i]f [Plaintiff] thought the department was understaffed, we discussed the possibility of hiring additional employees").) As discussed *supra*, Plaintiff testified that she could not set employee wages or the store labor budget, and that she lacked the authority both to determine labor hours for a store and to allocate labor hours in her assigned area within a store. (Jibowu Dep., Dkt. 100-1, at 390:6–16, 395:25–396:13.)

The evidence also shows that Plaintiff did not so much divide her time strictly between managerial and nonmanagerial duties as undertake them simultaneously. ETL-HR Roberts characterized Plaintiff's performance as "multi-tasking"—that is, "while [Plaintiff] was doing physical activity, [Roberts] also observed [Plaintiff] supervising and leading her team members, telling people what they needed to be doing, and motivating them at the same time." (Roberts Decl., Dkt. 86-26, ¶ 8.) Plaintiff also characterized her method of accomplishing goals "[n]ot [as] supervising [team members] in the performance of their work" but as "going through and making sure everything is getting done as you're pushing with them." (Jibowu Dep., Dkt. 100-1, 206:24–207:2; *see also id.* at 233:25–234:2 ("Part of it is just working with them. Working with the team and them seeing that I can do their job and so forth."); *id.* at 226:16–19 (stating that, as part of her

nonexempt work, "I created trust with my team, I recognized them for finishing up their workload"[20]).)[21]

An employee's time spent on managerial duties is not dispositive of the primary duty test, *see* 29 C.F.R. § 541.700(b), and "[c]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption," *id.* § 541.106(a). Here, the evidence suggests that Plaintiff was, at least at times, performing both exempt and nonexempt work at once, and the record is inconclusive as to the amount of time that Plaintiff spent on each type of work. *See Scott v. SSP Am., Inc.*, No. 09-CV-4399 (RRM) (VVP), 2011 WL 1204406, at *10–11 (E.D.N.Y. Mar. 29, 2011) (noting that the amount-of-time-spent factor "weigh[ed] neither in favor nor against a finding that [p]laintiff's primary duty was management" where plaintiff testified that she spent ninety percent of her time on nonexempt work and continued to supervise employees while performing this nonexempt work). Rather, the parties' evidence as to the time Plaintiff spent on each type of work and the extent of her multitasking creates a disputed issue of fact. *See Costello*, 928 F. Supp. 2d at 494 (finding that a material issue of fact remained as to the time plaintiff spent on managerial work and "refrain[ing] from assuming the ease of such multitasking in the specific context of [defendant's] stores in which [plaintiff] worked").

---

[20] While Defendant seems to argue that this type of behavior is indisputably managerial in nature, the Court notes that the DOL regulations do not support this conclusion. *See* 29 C.F.R. § 541.102. Rather, this inquiry is fact-specific. *See Scott*, 954 F.3d at 511 ("The question of how the employees spent their working time is a question of fact." (quoting *Pippins*, 759 F.3d at 239)).

[21] Some of Defendant's evidence similarly suggests that Plaintiff's nonmanagerial duties were a necessary byproduct of her managerial duties—i.e., that they served a sort of instructional or motivational role for her team. (*See, e.g.*, Gangaram Decl., Dkt. 86-16, ¶ 11 ("While [Plaintiff] did perform some manual work alongside her team, my impression was that she did this to motivate her team, not because there were not enough employees to complete the work.").) However, although Plaintiff may have done manual work at times to show support for and give direction to her team, this fact is not inconsistent with, nor does it undercut, her claim that she spent much of her time performing nonexempt tasks because of inadequate staffing.

c.     Freedom from direct supervision

As discussed *supra*, the evidence does not conclusively establish the extent of Plaintiff's managerial authority and whether Plaintiff made "decisions of the kind and quality normally made by persons formulating policy within [their] spheres of responsibility." *Stevens*, 2015 WL 4645734, at *5 (quoting *Clougher*, 696 F. Supp. 2d at 294). Although Plaintiff appears to have been free from direct supervision in overseeing the work of team leaders and team members, the evidence discussed *supra* also suggests that Plaintiff was subject to some level of oversight from both the STLs and other ETLs with respect to duties such as training, disciplining, hiring, and firing employees, as well as making personnel recommendations. *See Costello*, 928 F. Supp. 2d at 494–95 (finding that this factor weighed in favor of defendant where plaintiff "had a relatively free hand within his areas of influence" despite the evidence that "ultimate decision-making power and discretion lay elsewhere"). As such, there remains a disputed issue of material fact as to the degree of direct supervision to which Plaintiff was subject in her ETL roles.

d.     Plaintiff's salary compared to that of nonexempt employees

Plaintiff's annual salary as an ETL was initially $54,800 in Chicago, after which Plaintiff received several raises and earned $72,100 per year as of March 2017 in New York. (Def.'s 56.1, Dkt. 86-2, ¶¶ 247–53.) "The most common hourly rate for team members"[22] in Plaintiff's departments in Chicago was $9.50 in 2015 and $10.50 from January to August 2016 (*id.* ¶¶ 255–56), and "[t]he most common hourly rate for team members" in Plaintiff's departments in Brooklyn was $10.50 from August to December 2016, and $12.00 from January to October 2017 (*id.* ¶¶ 257–

---

[22] The Court notes that Defendant's 56.1 Statement includes only salary information for team members and not for team leaders, who presumably were paid more insofar as they supervised team members.

58).[23] Plaintiff acknowledged that she was paid "substantially more" than the team members with whom she worked. (*Id.* ¶ 266; Jibowu Dep., Dkt. 100-1, at 207:12–15.) Accordingly, the Court finds that Plaintiff's salary relative to that of the nonexempt team members favors a finding that managerial duties were her primary duty. *Cf. Trimmer v. Barnes & Noble, Inc.*, 31 F. Supp. 3d 618, 626 (S.D.N.Y. 2014) (finding that a salary structure whereby "plaintiffs earned 'little more than the nonexempt employees' . . . weigh[ed] against a finding that administrative or executive duties were the 'primary' duties of . . . the plaintiffs and that the plaintiffs were properly classified as exempt employees" (quoting 29 C.F.R. § 541.700(c)).

In sum, having considered the parties' evidence, and mindful that whether an employee's "primary duty" is managerial "should be resolved by examining the employees' actual job characteristics and duties," *Myers v. Hertz Corp.*, 624 F.3d 537, 548 (2d Cir. 2010), the Court finds that genuine disputes of fact regarding all of the relevant factors, except Plaintiff's relative salary, preclude a finding, as a matter of law, that Plaintiff's primary duty was management. *See Choi v. Home & Home Corp.*, No. 17-CV-5400 (ARR) (SMG), 2019 WL 4193449, at *6 (E.D.N.Y. Sept. 3, 2019) ("Where, as here, the plaintiff's primary duties are disputed, summary judgment is improper, on either the executive or administrative exemptions."); *Trimmer*, 31 F. Supp. 3d at 626 (denying defendants' motion for summary judgment on plaintiff's executive exemption claim where "defendants here point to no evidence that weighs *decisively* in favor of finding that the exempt duties were the 'principal, main, major, or most important' duties of the plaintiffs" (emphasis added)).

---

[23] As one estimate, the Court calculates that these hourly rates would translate to annual full-time gross pay amounts of $30,875, $34,125, and $39,000, respectively, assuming 55-hour workweeks—that is, with 15 hours of overtime—for 52 weeks of the year.

## 2.    Customarily and regularly directed the work of other employees

Under the third requirement of the executive exemption test, an employer must establish that the employee "customarily and regularly direct[ed] the work of two or more other employees." 29 C.F.R. § 541.100(a)(3). Plaintiff testified that some ten or more team members "work[ed] under [her]" when she was an ETL Replenishment, and that between two and ten team members worked under her when she was an ETL Sales Floor. (Jibowu Dep., Dkt. 100-1, 418:16–419:4.) Plaintiff clarified, however, that this number was "for the store. So they [we]re not necessarily under me, under my direction." (*Id.* at 419:8–11.) Plaintiff's testimony, in combination with the other evidence, creates a dispute of material fact over the extent to which she customarily and regularly directed the work of these team members.

Defendant's evidence purports to show Plaintiff regularly directing the employees working under her. According to ETL-HR Roberts, "[t]eam leaders worked directly under [Plaintiff] and helped her supervise the work of the team members responsible for executing tasks." (Roberts Decl., Dkt. 86-26, ¶ 10.) "When [ETL-HR Roberts] observed [Plaintiff] on the sales floor, [Roberts] saw [Plaintiff] leading and directing [Plaintiff's] team members to execute tasks in [Plaintiff's] department." (*Id.* ¶ 6.) Plaintiff's self-review noted, for example, that she "move[d] team members to the right areas" and was "captaining the signing team overnight to ensure an effective ad process." (Tomezsko Decl., RFA Ex. T, Dkt. 97-14, at ECF 25–26.) On at least one other occasion, Plaintiff informed the STL by email that she "started to move the team around in different areas." (*Id.* Ex. U, Dkt. 97-14, at ECF 28.)

Plaintiff's testimony suggests, however, that she did not customarily and regularly direct subordinates because "the team pretty much knew what was expected of them" (Jibowu Dep., Dkt. 100-1, at 220:16–17), "pretty much knew their roles" (*id.* at 220:21–22), and "already knew what

to do" (*id.* at 221:7).  (*See also id.* at 419:17–21 ("[Team members] already knew what to do based off of Target's policy.").)  Moreover, and consistent with her testimony that she performed primarily nonexempt tasks a majority of the time, Plaintiff testified that staff shortages meant that at times she did not have multiple employees working under her and subject to her direction.  "[I]f somebody tells me you need to get this done, I'm taking it as I need to get this[] [d]one[;] besides[,] I don't have the proper staff to get it done with just the staff, so if there is any given time one person in [a department] and myself, it is only two of us." (*Id.* at 286:16–21.)  In such an instance, Plaintiff would not have supervised two or more other employees.

As part of her regular ETL responsibilities, Plaintiff undertook an approximately nine-hour shift once a week as the LOD in her store.  (*Id.* at 171:24–172:17.)  During such shifts, team leader Gangaram observed Plaintiff "directing" team members from other departments.  (Gangaram Decl., Dkt. 86-16, ¶ 15.)  ETL-Logistics Pilla stated that, as LOD, Plaintiff had added responsibilities such as being "the go-to person for any issues that came up while she was in charge," "let[ting] team members and team leaders in and out of the building," and operating "her own individual alarm code." (Pilla Decl., Dkt. 86-23, ¶ 21.)  But, according to Plaintiff, her managerial authority did not actually increase when she was an LOD.  (Jibowu Dep., Dkt. 100-1, at 391:19–21.)  Furthermore, in addition to ETLs, both nonexempt senior team leaders and regular team leaders could be designated as LODs.  (*Id.* at 391:14–18.)  More importantly, even if it were undisputed that Plaintiff customarily and regularly directed employees while serving as an LOD, Plaintiff's nine-hour, weekly shift as an LOD alone would not suffice to show that she customarily and regularly directed employees as an ETL Replenishment or ETL Sales Floor generally.

Because there is conflicting evidence as to Plaintiff's actual authority to direct the employees working under her, the Court finds that summary judgment would be inappropriate as

to this requirement of the executive exemption test. *See Karropoulos*, 128 F. Supp. 3d at 534 ("[W]ithout the benefit of objective documentary evidence setting forth the [p]laintiff's responsibilities over other employees, this conflicting testimony presents a genuine issue of material fact that precludes the [c]ourt from finding as a matter of law that the [p]laintiff satisfies the third factor."); *Martinez*, 930 F. Supp. 2d at 527 ("The second criterion of the 'duties' test— that an exempt employee 'customarily and regularly' directs the work of two or more employees— also cannot be resolved on summary judgment because the extent of [the p]laintiffs' authority over the [supervisees] is disputed."). In addition, because the time that Plaintiff spent on managerial duties is disputed, the Court cannot conclude as a matter of law that Plaintiff "customarily and regularly" directed employees. *See Awan v. Durrani*, No. 14-CV-4562 (SIL), 2015 WL 4000139, at *6 (E.D.N.Y. July 1, 2015) (noting that courts have typically construed "customarily and regularly" as requiring an individual to supervise two or more full-time employees "at least seventy-five to eighty percent of the time" (internal quotation and citation omitted) (collecting cases)); *Rubery v. Buth-Na-Bodhaige, Inc.*, 470 F. Supp. 2d 273, 278 (W.D.N.Y. 2007) ("If the evidence demonstrates, however, that plaintiff's supervision of 80 subordinate hours occurred less than 80% of the time, then the jury should decide whether that frequency constitutes 'customary and regular.'" (citations omitted)).

### 3. Weight Given to Plaintiff's Recommendations to Hire, Fire, or Promote

The fourth requirement of the executive exemption test addresses whether an employee "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(4). In evaluating this requirement, the DOL regulations suggest that a court consider

whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. . . . An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

*Id.* § 541.105.

The record again contains disputed issues of fact as to Plaintiff's authority and the weight given to her recommendations in hiring, firing, and promoting employees. Defendant has proffered evidence indicating that Plaintiff on at least one occasion interviewed and recommended a candidate for a shift transition (Tomezsko Decl., RFA Ex. I, Dkt. 97-13, at ECF 18–19), and that Plaintiff noted to STL Gustafson that she "helped to promote two new perishables assistants" (Tomezsko Decl., RFA Ex. U, Dkt. 97-14, at ECF 28). Two of Plaintiff's ETL colleagues noted that Plaintiff was "involved in the process of interviewing and hiring new team members," as part of which Plaintiff offered recommendations. (Pilla Decl., Dkt. 86-23, ¶ 23; Roberts Decl., Dkt. 86-26, ¶ 23.) ETL-Logistics Pilla "consistently accepted [Plaintiff's] recommendation" to "post an opening for an overnight position on her team" (Pilla Decl., Dkt. 86-23, ¶ 23), and ETL-HR Roberts "relied on [Plaintiff's] recommendation to schedule interviews for new hires or post a new opening a majority of the time" (Roberts Decl., Dkt. 86-26, ¶ 23).

However, the same evidence indicates that Plaintiff's colleagues were not bound by her recommendations and that the STLs in particular had final decision-making authority. Plaintiff "conducted second-level interviews to hire new employees to her team," but the STL had authority to overrule her decision even though he "almost always deferred to [Plaintiff's] decision regarding

which individuals to hire."[24]   (Gustafson Decl., Dkt. 86-17, ¶ 33.)   STL Islar "recall[ed] approximately two to five instances in which [he] did not accept [Plaintiff's] recommendation to hire a candidate." (Islar Decl., Dkt. 86-18, ¶ 24.) Moreover, promotions involving a title change— e.g., from team member to team leader, or from team leader to ETL—required the involvement of multiple layers of management, including the District Team Leader ("DTL"). (Gustafson Decl., Dkt. 86-17, ¶ 36.) For promotions without a title change, Plaintiff would discuss these decisions with other ETLs and communicate a decision to the STL and HR for approval, which the STL "almost always accepted," but could reject. (Id. ¶ 37; see also Islar Decl., Dkt. 86-18, ¶ 28 ("I almost always accepted [Plaintiff's] recommendation to add someone to the talent pipeline.").) Similarly, with regard to firing, STL Gustafson explained that he accepted Plaintiff's recommendations on termination decisions "a majority of the time." (Gustafson Decl., Dkt. 86-17, ¶ 35.)

The ETL HR also limited Plaintiff's authority in this domain. ETL-HR Roberts "relied on [Plaintiff]'s recommendations to hire a candidate a majority of the time." (Roberts Decl., Dkt. 86-26, ¶ 24.) Roberts also described that Plaintiff "participated in the process of promoting team members" in "regular meetings" with other ETLs and the STL, at which Plaintiff "advocate[d] for team members or nominate[d] a team member to become an approved team trainer[.]" (Id. ¶ 25.) Roberts "relied on [Plaintiff] to make [] recommendations [for the talent pipeline] and ultimately placed the employee she recommended in the talent pipeline a number of times." (Id. ¶ 27.) An

---

[24] Although Plaintiff may not have needed permission from ETL-Logistics Pilla to make hiring decisions (see Pilla Decl., Dkt. 86-23, ¶ 24 ("[Plaintiff] did not need my approval to hire someone that she thought was a good fit for the role, and she was authorized to make hiring decisions without getting my permission or approval first.")), the other evidence discussed above establishes that Plaintiff was not free to make these decisions on her own and could only make recommendations for the STLs to consider.

employee in the talent pipeline would interview for the anticipated new role, and "[i]f all interviewers agreed that the person should be promoted," the employee would be placed on the "talent bench" until the position became available. (*Id.* ¶ 28.) "[Plaintiff]'s recommendation and feedback as to the team member's qualifications was a critical part of this process, and was always taken into consideration." (*Id.*) After participating in interviews, Plaintiff "referred the candidate to [the STL] and [HR] for final sign-off." (Islar Decl., Dkt. 86-18, ¶ 24.) However, for promotions involving a pay grade increase or title change, "[Plaintiff] gave a recommendation as to whether the team member should be promoted, and her STL and [Roberts] relied on her recommendations a majority of the time." (Roberts Decl., Dkt. 86-26, ¶ 26.) Similarly, ETL-Logistics Pilla stated that Plaintiff was "involved in promoting team members" and "frequently made recommendations to promote a team member," and Pilla would "agree[] with her recommendations . . . a majority of the time." (Pilla Decl., Dkt. 86-23, ¶ 30.)

The evidence establishes that Plaintiff herself was not authorized to make, and never made, any hiring, firing, or promotion decision, and indicates that, at most, her authority was limited to making recommendations regarding personnel decisions. Indeed, Plaintiff testified unequivocally that she did not have the authority to promote or fire employees. (Jibowu Dep., Dkt. 100-1, at 389:9–14, 394:25–395:5.) Furthermore, according to Plaintiff, her personnel-related recommendations were largely *pro forma*; while she usually "gave an opinion" in the process of hiring or promoting an employee, she believed that her recommendations "[were not] always taken into consideration" because "[t]he decision was up to the STL and HR." (*Id.* at 231:12–21; *see also id.* at 232:3–9 ("I didn't always give my opinion. . . . I didn't feel like my opinion was valued because it was just like, all right, hey, we are just asking you just to ask you.").)

The Court finds that the evidence again presents a disputed issue of material fact as to the fourth factor of the executive exemption test. Although Defendant's evidence that Plaintiff's recommendations regarding personnel decisions were relied on a "majority" of the time is plainly relevant to the question of how much weight Plaintiff's recommendations were accorded, it does not conclusively establish that Plaintiff's recommendations were given "particular weight," or even that Plaintiff was consistently asked to give her recommendations. *See Karropoulos*, 128 F. Supp. 3d at 535 (noting that "the DOL regulations clearly state 'an occasional suggestion with regard to the change in status of a co-worker' is not sufficient to show that an employee's recommendations on hiring or firing were given a particular weight" (citing, *inter alia*, 29 C.F.R. § 541.105)); *Costello*, 928 F. Supp. 2d at 489 (noting that "the absence of affidavit testimony demonstrating that [plaintiff's] recommendations actually had an impact on those receiving them . . . fail[ed] to resolve the issue of material fact raised by [plaintiff's] testimony that his opinions were not accorded particular weight by his supervisors"); *see also Martinez*, 930 F. Supp. 2d at 527 n.18 ("[T]he Court is not persuaded that simply having the authority to initiate disciplinary proceedings is sufficient to satisfy § 541.100(a)(4), especially on a motion for summary judgment.").

*     *     *

In light of the disputed issues of fact discussed above, the Court declines to find that Defendant has established, as a matter of law, that Plaintiff was properly classified as an exempt executive under the FLSA, NYLL, and IMWL.[25] Defendant's motion for summary judgment as to Plaintiff's executive misclassification claims is accordingly denied.

---

[25] As discussed *supra*, the FLSA executive exemption analysis is the same as that under the NYLL and IMWL.

## III. Remaining State Law Claims

Defendant Target also moves for summary judgment dismissal of Plaintiff's remaining state law claims under the NYLL and IWPCA. (Def.'s Mem., Dkt. 86-1, at 24–25.)

### A. NYLL Wage Statement and Recordkeeping Provisions

Plaintiff has alleged violations of the wage statement and recordkeeping requirements of the NYLL, presumably for Defendant's failure to include on Plaintiff's wage statements the number of hours worked per week and applicable overtime pay rate for hours worked over forty in one week. (Compl., Dkt. 1, ¶¶ 75–82.) Defendant argues that, because Plaintiff was classified as an exempt employee, she has no basis on which to allege a wage-statement violation on non-exempt grounds. (Def.'s Mem., Dkt. 86-1, at 24.)

The recordkeeping provision of the NYLL provides that each employer "establish, maintain and preserve" true and accurate payroll records. N.Y. Lab. Law § 195(4). "[N]othing in the NYLL authorizes an independent cause of action based on a violation of § 195(4)." *Carter v. Tuttnaeur U.S.A. Co., Ltd.*, 78 F. Supp. 3d 564, 571 (E.D.N.Y. 2015); *accord. Chan v. Big Geyser, Inc.*, No. 17-CV-6473 (ALC), 2018 WL 4168967, at *10 (S.D.N.Y. Aug. 30, 2018).

The wage statement provision of the NYLL provides that an employer shall "furnish each employee with a statement with every payment of wages" listing, *inter alia*, regular hourly rates of pay, overtime pay rates, and the number of regular and overtime hours worked "[f]or all employees who are not exempt from overtime compensation." N.Y. Lab. Law § 195(3). As discussed above, the Court finds that Defendant has not established, as a matter of law, that Plaintiff was properly classified as an exempt executive employee. Because Defendant's alleged noncompliance with § 195(4) turns on whether Plaintiff is exempt, the Court denies Defendant's motion for summary judgment on this claim as well. *Cf. Mohammed v. Start Treatment &*

*Recovery Ctrs., Inc.*, 95 N.Y.S.3d 711, 717 (App. Div. 2019) ("Since [the number of hours worked and the applicable overtime pay rates] are inapplicable to a bona fide administrative employee, as plaintiff has been determined to be, we further find that defendant established its entitlement to summary judgment dismissing plaintiff's [NYLL § 195(3)] cause of action.").

## B. IWPCA

Plaintiff has also alleged that she is owed unpaid overtime wages under the IWPCA. (Compl., Dkt. 1, ¶¶ 88–91.) Defendant argues that, as Plaintiff had no contract with Target to receive overtime pay, she has no claim to overtime under the IWPCA. (Def.'s Mem., Dkt. 86-1, at 24–25.)[26] The Court agrees.

"The IWPCA does not establish a substantive right to payment of any particular regular or overtime wage, and mandates payment of wages only to the extent the parties' contract or employment agreement requires such payment." *Charlot v. Ecolab, Inc.*, 97 F. Supp. 3d 40, 64 (E.D.N.Y. 2015) (internal quotation and citation omitted); *see also Enger v. Chicago Carriage Cab Corp.*, 812 F.3d 565, 568–69 (7th Cir. 2016) (noting that the IWPCA requires that a plaintiff demonstrate that they are owed compensation pursuant to a contractual agreement). Here, Plaintiff's contract with Target did not require overtime payment. Thus, "[e]ven taking as true that the employee handbook correctly stated that Defendant['s] pay policies complied with the law, this [claim] fails to allege the parties' mutual assent to specific terms as required to establish the existence of a valid agreement." *Flood v. Carlson Rests. Inc.*, No. 14-CV-2740 (AT) (GWG),

---

[26] Although Plaintiff has indicated that she does not oppose summary judgment on her IMWL claim (*see* Pl.'s Opp'n, Dkt. 88, at 11 n.7), the Court assumes that this is in error and that she is actually referring to her IWPCA claim, since Plaintiff's IMWL misclassification claim is evaluated pursuant to the same standards as her FLSA and NYLL claims. Notably, Plaintiff's opposition memorandum does not mention her IWPCA claim, further suggesting that she intended not to oppose dismissal of that claim, rather than her IMWL overtime wage claim. (*See generally* Pl.'s Opp'n, Dkt. 88.)

2016 WL 3221146, at *4 (S.D.N.Y. June 7, 2016) (citation omitted). Accordingly, Plaintiff's IWPCA claim is dismissed.

*　　*　　*

In sum, for the reasons discussed above, the Court denies Defendant's summary judgment motion in its entirety, except as to Plaintiff's IWPCA claim.

## PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION

### I.    Background

In addition to the facts discussed with respect to Defendant's motion for summary judgment, the Court considers additional facts relevant to the motion of Plaintiff Jibowu and the opt-in Plaintiffs (collectively, "Plaintiffs") seeking conditional certification of a FLSA collective action. (Dkt. 79.)

### A.    Opt-in Plaintiffs

After Plaintiff Jibowu commenced this action on June 28, 2017 (*see generally* Compl., Dkt. 1), eight former Target ETLs joined this action as opt-in Plaintiffs: Nathan Wood and Nickolas Wolfe joined the action on June 29, 2017 (Dkt. 6); Ashley Bleem, Philip Spagnolo, and Kimberly Steckler joined on September 14, 2017 (Dkt. 26); Brielle Engeran joined on September 26, 2017 (Dkt. 27); and Isaura Isais joined on February 5, 2019 (Dkt. 62). An eighth opt-in Plaintiff, Kevin West, consented to join this action on July 27, 2018 (Dkt. 41) but, on March 7, 2019, accepted an offer of judgment pursuant to Federal Rule of Civil Procedure 68 and left the collective (Dkt. 64).[27]

---

[27] Defendant's Rule 68 offer of judgment to West was in the amount of $7,500. (Dkt. 64-1, at 1.)

Ashley Bleem worked at Target stores in Norman, Lawton, and Edmond, Oklahoma, from June 2012 to September 2016 as an ETL Food, ETL Guest Experiences, and ETL Softlines. (Deposition of Ashley Bleem ("Bleem Dep."), Dkt. 79-4, at 58:22–59:15, 355:8–14.) Bleem testified that, across all of her ETL positions, she worked 60 to 65 hours per week (id. at 355:15–17), and that her STL instructed her to do physical or manual work every day (id. at 356:1–12). Bleem testified that her assigned tasks included stocking shelves, working the cash register, placing newly received merchandise in its proper location, unpacking merchandise, setting up displays, cleaning the store, folding clothes, assisting customers, and preparing food. (Id. at 358:21–359:17.) Bleem further testified that she spent eighty-five to ninety percent of her time engaged in such manual work. (Id. at 362:17–22.)

Brielle Engeran worked as an ETL Logistics from October 2011 to October 2014 in a Target store in Covington, Louisiana. (Plaintiffs' Memorandum of Law in Support of Their Motion for Conditional Certification ("Pls.' Mem."), at 3.) Plaintiffs have not submitted a deposition or any other sworn statement from Engeran.[28]

Isaura Isais worked as an ETL Guest Experience, ETL Softlines, combination of ETL Guest Experience and Softlines, and ETL Sales Floor at Target stores in Fullerton and Eastville, California, from November 2007 until April 2019. (Declaration of Isaura Isais ("Isaia Decl."), Dkt. 79-5, ¶¶ 2–3.) According to Isais, in each of her ETL positions, she and her co-ETLs regularly

---

[28] As Defendant notes, the record does not include any evidence from Engeran in support of Plaintiffs' motion for conditional certification. (Defendant's Opposition to Plaintiffs' Motion for Conditional Certification ("Def.'s Opp'n"), Dkt. 80, at 13 n.7.) Moreover, Defendant argues, Engeran does not fall within the collective proposed by Plaintiffs, which excludes Logistics ETLs in stores that also employed Replenishment ETLs. (Id.; see also Pls.' Mem., Dkt. 79-1, at 1 (describing scope of the proposed collective).) Defendant claims to have informed Plaintiffs of this on July 2019. (Def.'s Opp'n, Dkt. 80, at 13 n.7 (record citation omitted).) To date, the Court has not received a response from Plaintiffs as to Engeran.

worked more than sixty hours per week; Isais also worked on occasion at seven other Target stores in California and observed the same trend among ETLs there. (*Id.* ¶¶ 4–6, 8.) Isais spent the majority of her time as an ETL doing manual tasks such as unloading trucks, moving freight, stocking shelves, organizing product, making labels, setting up displays, retrieving shopping carts in the parking lot, and working the cash register. (*Id.* ¶ 7.) When Isais complained about this practice to her STL, she "was told that this was just the nature of the ETL job." (*Id.* ¶ 6.) Isais further stated that she did only "rote and infrequent" management work because the STL and HR department "had final discretion over all firing, hiring, scheduling[,] and disciplinary decisions." (*Id.* ¶ 13.)

Philip Spagnolo was an ETL Sales Floor and ETL Guest Experience from October 2013 to December 2014 in Target stores in Sandusky and Macedonia, Ohio. (Deposition of Philip Spagnolo ("Spagnolo Dep."), Dkt. 79-6, at 27:14–17, 37:23–25, 86:16–20.) As an ETL, Spagnolo stocked shelves, worked the cash register, unpacked merchandise, set up shelving, folded clothing, assisted customers, straightened shelves, took down and put up signs, used equipment to move product, and gathered shopping carts from outside the store. (*Id.* at 277:9–279:22, 285:11–287:10.) He testified that he spent ninety to ninety-five percent of his time performing these types of nonmanagerial duties (*id.* at 279:21–280:5, 287:17–22) because the store "was usually understaffed" (*id.* at 284:2–11). Spagnolo further testified that, as an ETL, he did not have the authority to fire, promote, or independently discipline employees; could not establish store policies, new practices, or procedures; and could not set employee wages. (*Id.* at 280:6–281:12, *see also id.* at 287:23–288:22.) Spagnolo's authority as an ETL did not increase when the STL was not in the store (*id.* at 282:9–283:3), nor did it change when he was an LOD (*id.* at 283:13–

284:1). Spagnolo testified that he worked an average of fifty-five to sixty-five hours per week as an ETL. (*Id.* at 284:21–24.)

Kimberly Steckler was employed by Target from approximately June 2001 through September 2015 and was an ETL at Target stores in Erie, Pennsylvania (ETL Softlines); Scranton, Pennsylvania (ETL Softlines, Hardlines, and Guest Experience); Fairfield, Ohio (ETL Softlines, Guest Experience); and South Lebanon, Ohio (ETL Sales Floor). (Declaration of Kimberly Steckler ("Steckler Decl."), Dkt. 79-7, ¶ 1.) Steckler declared that she regularly worked approximately fifty to sixty hours per week as an ETL (*id.* ¶ 9), during which she spent ninety to ninety-five percent of her total work time doing manual labor-type tasks, such as working the cash register, building sales planners, unloading freight, unpacking merchandise, setting up displays, cleaning, folding clothes, assisting customers, remerchandising, putting up and taking down signs, and filling in for hourly associates (*id.* ¶ 2). Although she held the ETL title, Steckler declared that she "had no authority to manage the store"—she could not change corporate policy, set prices, change hourly pay rates, make inventory decisions, or promote, hire, or fire employees. (*Id.* ¶ 4.) Steckler's work was assigned to her through corporate directives (*id.* ¶ 5), and she was required to contact either her STL, an STL from another store, or the DTL for management decisions (*id.* ¶ 6). Steckler declared that she observed other ETLs "perform[ing] the same or similar primary duties" during her employment with Defendant. (*Id.* ¶ 12.)

Nickolas Wolfe spent the majority of his ETL employment at a Target store in Richardson, Texas, from October 2012 to August 2016. (Deposition of Nickolas Wolfe ("Wolfe Dep."), Dkt. 79-9, at 47:22–25, 52:5–7, 69:2.) As an ETL, Wolfe worked an average of 60 hours per week. (*Id.* at 346:12–17.) Wolfe testified that, as an ETL Hardlines, he received direction from the STL (*id.* at 346:23–347:1) and from Defendant as a corporate entity (*id.* at 347:20–22). Wolfe further

testified that, in his ETL roles, he spent eighty to eighty-five percent of his time performing duties that included stocking the shelves, working the cash register, unpacking merchandise, organizing merchandise, setting up displays, cleaning the store, folding clothes, assisting customers, zoning, putting up and taking down signs, and using machinery to move stock around the store. (*Id.* at 348:9–350:6, 350:12–351:2, 351:8–20.)

Nathan Wood was an ETL from 2001 or 2002 until 2016 in Target stores located in Rowlett, Richardson, Garland, and Mesquite, Texas. (Deposition of Nathan Wood ("Dep. Wood"), Dkt. 79-8, at 16:13–15, 431:12–432:8.) Wood was, at various times, an ETL Food, ETL Sales Floor, ETL Guest Experience, and ETL Logistics. (*Id.* at 432:11–12, 435:7–14.) As an ETL Food, Wood followed the corporate checklists for his assignments and otherwise received direction from the store manager. (*Id.* 432:11–18.) Wood testified that, as an ETL Food, he did not have the authority to promote, fire, or independently discipline employees, or to set policy for the store. (*Id.* at 439:12–23.) Wood further testified that his tasks included manual work such as unloading trucks, stocking freight, registering, and cleaning, and that that other ETLs were doing "the same type of tasks." (*Id.* at 435:2–14.) Wood also set up displays, cleaned the stores, folded clothing, assisted customers, put up signs, worked in the deli, cleaned out dairy coolers, sliced lunchmeat, and made sandwiches, salads, and pizzas. (*Id.* at 437:8–438:13.) Wood testified that, on average, he worked sixty hours per week (*id.* at 435:15–18) and spent around ninety percent of his time on these types of manual-work duties (*id.* at 439:8–11).

## B.      Relevant Procedural History

Plaintiff Jibowu commenced this action on June 28, 2017 (Compl., Dkt. 1), and Defendants answered on August 7, 2017 (Dkt. 13). On August 22, 2017, the Court granted the parties' joint request to stay discovery. (*See* Dkt. 25; Aug. 25, 2017 Order.) On January 11, 2018, the Court

lifted the stay of discovery. (Jan. 11, 2018 Order.) On February 16, 2018, the parties held an initial discovery conference at which the Honorable Cheryl L. Pollak set deadlines for mandatory disclosures, document requests, interrogatories, and initial-phase depositions of Plaintiff Jibowu and the opt-in Plaintiffs. (Feb. 16, 2018 Minute Entry, Dkt. 34.) On July 6, 2018, Defendant sought to compel depositions of the opt-in Plaintiffs in Minneapolis, Minnesota (Dkt. 39), which request Judge Pollak denied on September 17, 2018 (Dkt. 43). Defendant then filed a request on October 3, 2018 to conduct an additional half-day deposition of Plaintiff Jibowu (Dkt. 45), which Judge Pollak also denied on October 30, 2018 (Dkt. 52). On December 13, 2018, Plaintiffs moved for a protective order from Defendant's first RFA (Dkt. 53),[29] which Judge Pollak granted in part and denied in part on March 20, 2019 (Dkt. 66). Defendant filed a motion to compel on January 17, 2019 (Dkt. 57), which Judge Pollak resolved on February 21, 2019 by ordering disclosure of a recording made by opt-in Plaintiff Bleem, and text messages from Plaintiff Jibowu (Dkt. 63).

Following discovery proceedings, Plaintiffs moved on September 6, 2019 to certify a FLSA collective action[30] comprised of

> certain specified current and former [ETLs], specifically Food ETLs, Sales Floor ETLs, Softlines ETLs, Hardlines ETLs, Guest Experience ETLs, Replenishment ETLs, and Logistics ETLs in stores that do not have Replenishment ETLS, employed by Defendants . . . at any store location within the United States, and at any time from June 28, 2014 to the present (the "Collective Action Period").

---

[29] Specifically, Plaintiffs argued that the RFA "constitute[d] an attempt to circumvent [Judge Pollak]'s October 30, 2018 Order ([Dkt. 52])[;] . . . include[d] multiple improper requests regarding the content and interpretation of documents, contrary to Fed. R. Civ. P. 36; and . . . [was] unduly burdensome and disproportional to the needs of a straightforward FLSA misclassification case." (Dkt. 53, at 1.)

[30] At this stage in analyzing Plaintiffs' collective action brought pursuant to the FLSA, the Court need only "consider whether the alleged policies violate federal law." *See Placinta v. Grazina Pilka, Inc.*, No. 16-CV-4272 (KAM) (SJB), 2018 WL 5024170, at *7 (E.D.N.Y. Oct. 5, 2018) (collecting cases).

(Pls.' Mem., Dkt. 79-1, at 1 (footnote omitted).)[31]  Plaintiffs have submitted with their motion a proposed Notice and Consent Form (Dkt. 79-19) and Reminder Postcard (Dkt. 79-20).

## II.   Legal Standard

The FLSA establishes a right "to bring an action by or on behalf of any employee, and [a] right of any employee to become a party plaintiff to any such action," subject to certain conditions. 29 U.S.C. § 216(b). "One of the principal conditions to proceeding collectively under § 216(b) is that the named plaintiffs be 'similarly situated' to the opt-in 'party plaintiff[s].'" *Scott*, 954 F.3d at 515 (citing 29 U.S.C. § 216(b)).  Based on this requirement, the Second Circuit applies a two-step certification process for opt-in collective actions under the FLSA.

> At step one, the district court permits a notice to be sent to potential opt-in plaintiffs if the named plaintiffs make a modest factual showing that they and others together were victims of a common policy or plan that violated the law.  At step two, with the benefit of additional factual development, the district court determines whether the collective action may go forward by determining whether the opt-in plaintiffs are in fact similarly situated to the named plaintiffs.

*Scott*, 954 F.3d at 515 (quoting *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 540 (2d Cir. 2016)).  "[T]he purpose of the first step of conditional certification is to provide notice to potential plaintiffs, and it is not until the second step, sometimes referred to as the 'decertification stage,' that a court will scrutinize membership in the class." *Mason v. Lumber Liquidators, Inc.*, No. 17-CV-4780 (MKB) (RLM), 2019 WL 3940846, at *4 (E.D.N.Y. Aug. 19, 2019) (citation omitted). "If the plaintiffs can satisfy this minimal burden [at step one][,] the court certifies the class and provides for notice to be sent to the potential class members who are then given the chance to opt in to the action." *Id.* (internal quotation, citations, and alteration omitted).

---

[31] Plaintiffs note that, as a result of discovery, this putative collective was pared down from the collective of "all ETLs" initially alleged in the Complaint.  (*Id.* at 1 n.1.)

At step one, a plaintiff must make a "modest factual showing," the key element of which "is a shared unlawful policy; that is, while the proposed collective need not be identical in every possible respect, its potential members must be similarly situated with respect to the allegedly unlawful policy or practice." *Korenblum v. Citigroup, Inc.*, 195 F. Supp. 3d 475, 479, 480 (S.D.N.Y. 2016) (internal quotations and citations omitted). Step one is not meant to be prohibitive and is intended "merely to determine whether 'similarly situated' plaintiffs do in fact exist." *Myers*, 624 F.3d at 555; *Viriri v. White Plains Hosp. Med. Ctr.*, 320 F.R.D. 344, 348 (S.D.N.Y. 2017) (same). "The court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations at this stage." *Garcia Ramos v. DNC Food Serv. Corp.*, No. 19-CV-2967 (VSB), 2020 WL 2832776, at *2 (S.D.N.Y. June 1, 2020) (internal quotation and citation omitted). Indeed, "[p]laintiffs may satisfy this [step one] requirement by relying on their own pleadings, affidavits, declarations, or the affidavits and declarations of other potential class members." *Id.* (citation omitted). "[T]he law in this Circuit is clear that the proper inquiry at this stage is whether *plaintiff* has made the requisite showing, without reference to what defendant may have sought to inject into the record." *Tello v. A.N.G. Diner Corp.*, No. 17-CV-749 (RRM) (CLP), 2018 WL 840045, at *5 (E.D.N.Y. Feb. 12, 2018) (emphasis in original).

However, where discovery has been completed as to the step one inquiry, a court may adopt a "modest 'plus' standard," in which the court "will look beyond the pleadings and affidavits submitted by [p]laintiffs and will consider the evidence submitted by both parties." *Korenblum*, 195 F. Supp. 3d at 482 (applying heightened standard where both parties had taken depositions); *accord McDermott v. Fed. Sav. Bank*, No. 14-CV-6657 (JMA) (GRB), 2018 WL 1865916, at *5 (E.D.N.Y. Apr. 18, 2018) ("[W]here discovery has been conducted on the issue of conditional certification, the Court should consider all evidence relevant to that determination."); *see also*

*Gaston v. Valley Nat'l Bancorp*, No. 17-CV-1886 (FB) (SMG), 2018 WL 4158407, at *2 (E.D.N.Y. Aug. 30, 2018) (describing the modest-plus standard as "a sliding scale, with progressively more scrutiny applied as more evidence enters the record" (internal quotation and citation omitted)). This heightened standard is rooted in efficiency concerns, and a reviewing court "should deny conditional certification if it determines that the solicitation of additional opt-ins through court-authorized notice would not promote efficient resolution of common issues." *Brown II*, 2018 WL 3105068, at *7; *see also Sloane v. Gulf Interstate Field Servs., Inc.*, No. 16-CV-1571, 2017 WL 1105236, at *8 (M.D. Pa. Mar. 24, 2017) ("[I]t would be an entirely inefficient use of resources for [a court] to conditionally certify a collective action, only to double-back because the bulk of discovery it already considered has cast an ominous shadow upon the propriety of the ultimate merits.").

## III. Step-One Analysis for Conditional Certification

At step one, Plaintiffs must demonstrate that they are similarly situated to the ETLs in the proposed collective. As discussed *supra*, the opt-in Plaintiffs have supplied sworn statements attesting that both they and members of the proposed collective were subject to the same "common employment policy," under which they worked more than forty hours per week, performed tasks akin to those performed by nonexempt employees, and were nevertheless classified by Defendant as exempt employees. (*See* Pls.' Mem., Dkt. 79-1, at 1.) Defendant maintains that Plaintiffs' motion should be denied because Plaintiffs cannot identify a "formal policy [of misclassification] applicable to all ETLs." (Defendant's Opposition to Plaintiffs' Motion for Conditional Certification ("Def.'s Opp'n"), Dkt. 80, at 15.) Defendant also notes that, in the period "[b]etween June 28, 2014, and June 28, 2019, there were approximately 14,267 current and former ETLs working in the" ETL roles that comprise the proposed collective—ETL Salesfloor, ETL Softlines,

ETL Hardlines, ETL Food, ETL Guest Experience, ETL Replenishment, and ETL Logistics in stores that do not have the ETL Replenishment role. (Declaration of Michael Brewer ("Brewer Decl."),[32] Dkt. 80-1, ¶ 6.)

The parties conducted discovery at least in part on the question of step-one FLSA conditional certification for over eighteen months. (Pls.' Mem., Dkt. 79-1, at 21; *see also id.* at 2 (noting that, "[p]ursuant to FLSA practice, discovery was bifurcated into two stages," with the first stage addressing solely the "similarly situated" analysis at step one).)[33] Given this length of time, and bearing in mind the significant scope of discovery, the Court adopts a "sliding scale" approach to the "modest-plus" standard in determining whether the opt-in Plaintiffs are "similarly situated" to the ETLs of the proposed collective at step one.[34] *See Gaston*, 2018 WL 4158407, at *2;

---

[32] Michael Brewer is Defendant's designee pursuant to Federal Rule of Civil Procedure 30(b)(6) and is a Director of Employee Relations for Target. (*See* Brewer Decl., Dkt. 80-1, ¶ 1.)

[33] During this time, the parties were also conducting discovery relevant to Defendant's summary judgment motion. Plaintiffs aver that "Defendants' practices have added months to first-stage discovery in this matter, and a process that should routinely take 3–4 months has, in this case, taken over 18 months." (*Id.*)

[34] Plaintiffs argue "that the modest plus standard discussed in *Korenblum* is the exception rather than the rule," and that "the overwhelming case law in this Circuit clearly holds that a heightened standard is not appropriate during the first stage of the conditional certification process and should only be applied once the entirety of discovery has been *completed*." (Pls.' July 23, 2020 Letter, Dkt. 127, at 2 (emphasis in original) (quoting *Franze v. Bimbo Foods Bakeries Distrib., LLC*, No. 17-CV-3556 (NSR) (JCM), 2019 WL 1417125, at *3 (S.D.N.Y. Mar. 29, 2019)).) The Court notes that Plaintiffs at the same time emphasize the size of the record developed in this action, maintaining that they "have proffered well more than in . . . nearly all cases in which this Court has granted FLSA notice." (Pls.' July 15, 2020 Letter, Dkt. 125, at 2–3; *see also* Plaintiffs' Reply Memorandum of Law ("Pls.' Reply"), Dkt. 91, at 1 n.1 (stating that Plaintiffs have put forward a "panoply of evidence" for their conditional certification motion).) Under the "sliding scale" approach to the modest-plus standard, the Court considers all available discovery, *see Gaston*, 2018 WL 4158407, at *2, but does "not weigh the merits of the underlying claims in determining whether potential opt-in plaintiffs may be similarly situated," *Julian v. MetLife, Inc.*, 298 F. Supp. 3d 699, 703 (S.D.N.Y. 2018) (internal quotation and citation omitted).

*Korenblum*, 195 F. Supp. 3d at 482; *cf. Griffin v. Aldi, Inc.*, No. 16-CV-354 (LEK) (ATB), 2017 WL 1397320, at *4 (N.D.N.Y. Feb. 22, 2017) (declining to apply the "modest plus" standard where the parties had conducted three months of limited discovery with respect to step-one certification). The Court does not consider the step-two inquiry, or any new interpretation of legal standards pertaining to step two, at this time.[35]

---

[35] The parties have submitted a number of letters to the Court with updates on recently decided FLSA certification cases that they argue should affect this Court's step-one certification decision. First, the parties debate whether the Second Circuit's holding in *Scott v. Chipotle Mexican Grill*, 954 F.3d 502 (2d Cir. 2020), suggests that the Court should grant step-one conditional certification in this action. (*See* Pls.' April 10, 2020 Letter, Dkt. 115, at 2; Def.'s April 17, 2020 Letter, Dkt. 117, at 1; *see also* Dkts. 118, 119, 120, 121 (discussing, *inter alia*, whether this action should be stayed in light of the stay of the Circuit's mandate in *Scott* pending application of a writ of *certiorari* to the United States Supreme Court); Pls.' Sept. 2, 2020 Letter, Dkt. 128 (noting that the defendant in *Scott* has filed a petition for *certiorari* with the Supreme Court, and "[t]he Second Circuit has granted a stay of the panel's mandate until final disposition of the [] petition").) The Court finds *Scott* inapplicable to its decision in this action, however, both because *Scott* reviewed a district court's step-two decertification of a FLSA collective, and because the holding in *Scott* addressed the applicability of Rule 23 standards at the step-two conditional certification stage. *See Scott*, 954 F.3d at 520 ("[W]e hold that the requirements for certifying a class under Rule 23 are unrelated to and more stringent than the requirements for 'similarly situated' employees to proceed in a collective action under § 216(b)."); *id.* at 515–16 (reviewing the two-step collective certification process under the FLSA without modifying the step-one analysis). Plaintiffs argue that the Court should nevertheless infer from *Scott* that "what might suffice at the second stage certainly has to suffice at the first stage." (Pls.' April 21, 2020 Letter, Dkt. 118, at 2.) While this may be correct, because *Scott* did not materially address the legal standard at step one and certainly did not suggest that this standard should be modified, the Court need not rely on *Scott* at all.

Plaintiffs wrote again to the Court to highlight the July 7, 2020 Report and Recommendation ("R&R") in *Outlaw v. Red Robin International*, No. 18-CV-4357 (GRB) (AYS) (E.D.N.Y. July 7, 2020), in which the Honorable Judge Anne Y. Shields, United States Magistrate Judge, recommended granting step-one conditional certification to a nationwide class of restaurant employees claiming executive misclassification under the FLSA. (Dkts. 123, 125.) In reply, Defendant noted first that the R&R had not yet been adopted by the district court and, second, that both *Outlaw* and the cases upon which it relies are factually distinguishable from the instant action, as discovery in those cases was more limited. (Def.'s July 14, 2020 Letter, Dkt. 124, at 1; Def.'s July 22, 2020 Letter, Dkt. 126.) The Court agrees with Defendant as to the appropriate weight to accord to the R&R at this stage and separately considers the other cases relied on by *Outlaw* as relevant to its step-one certification analysis *infra*.

## A.    ETLs' Exempt Classification

"Generally, to certify a nationwide collective action in a[] FLSA exemption case, [] plaintiff[s] must ultimately demonstrate a nationwide policy pursuant to which managers are assigned duties that render the employer's exempt classification inappropriate." *Mason v. Lumber Liquidators, Inc.*, No. 17-CV-4780 (MKB) (RLM), 2019 WL 2088609, at *8 (E.D.N.Y. May 13, 2019) (internal quotation, citations, and alterations omitted); *see also Korenblum*, 195 F. Supp. 3d at 480 ("[P]otential members must be similarly situated with respect to the allegedly unlawful policy or practice." (citation omitted)). "[T]he mere classification of a group of employees—even a large or nationwide group—as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for § 216(b) purposes." *Brown v. Barnes & Noble, Inc.* ("*Brown I*"), 252 F. Supp. 3d 255, 262 (S.D.N.Y. 2017) (collecting cases); *see also McDermott*, 2018 WL 1865916, at *4 (noting that plaintiffs "failed to identify any such policy other than their classification as exempt, which is insufficient to show that they are similarly situated" (citing *Brown I*, 252 F.3d at 262)).

Plaintiffs argue that, because the official ETL job requirements, leadership expectations, and training are the same for all Target ETLs, Plaintiffs are similarly situated to the members of the proposed collective for the purposes of the step-one analysis. (Pls.' Mem., Dkt. 79-1, at 4–9.) Defendant does not dispute that it classifies ETLs across all Target stores as exempt employees. (*See* Deposition of Michael Brewer ("Brewer Dep."), Dkt. 105-5, at 52:24–55:24.) The record evidence confirms the uniformity of the ETL position across Defendant's stores nationally. In his deposition, Mr. Brewer testified that the "common core roles" and expectations are the same "for all ETLs" nationwide and mandate, *inter alia*, that an ETL "be [their] best self," promote a "healthy

team culture," and "drive profitable sales." (Brewer Dep., Dkt. 105-5, at 74:1–79:12; *see also* ETL Core Roles, Dkt. 79-11, at ECF 2–3.) The job requirements for the ETL position also apply universally across all ETLs and include, *inter alia*, the ability to "move merchandise with appropriate equipment," "place and arrange items on all shelves," "climb and descend ladders carrying merchandise," "lift 40 pounds," and "handle all products sold by Target." (Brewer Dep., Dkt. 105-5, at 77:19–19; ETL Core Roles, Dkt. 79-11, at ECF 10.) Target lays out the policies and practices for its exempt team members in the Handbook (Handbook, Dkt. 99-1), which at any given time applies to all exempt employees at Target, including ETLs (Brewer Dep., Dkt. 105-5, 89:17–90:12). Defendant also expected its ETLs to manage their teams according to the expectations set out in the "b.a.s.i.c.s." toolkit (*id.* at 137:8–138:10; Toolkit, Dkt. 99-3), and to adhere to a variety of other standardized procedures (*see, e.g.*, LOD Closing Checklist, Dkt. 99-2). Defendant states that, beginning in 2013, all Target ETLs nationwide also have undergone the same six-week Business College training course with a standardized curriculum. (Brewer Dep., Dkt. 105-5, 95:2–22; *see also* Business College Training Booklet, Dkt. 99-4.)

**B.      Step-One Analysis**

Drawing upon ETLs' uniform executive classification, ETLs' similar requirements and responsibilities across Target stores nationwide, similar corporate policies with respect to ETLs, and ETLs' standardized training, Plaintiffs maintain that the Court can infer that members of the proposed ETL collective are "similarly situated" in that they were subject to the same unofficial policy of exempt misclassification. (Pls.' Mem., Dkt. 79-1, at 12–20.) Defendant argues that Plaintiffs have not shown that they are similarly situated to the proposed nationwide collective of ETLs with regard to this unofficial policy, as Defendant's national policy is lawful, and there is

variation between the actual job duties performed by Plaintiffs and those ETLs in the proposed collective. (Def.'s Opp'n, Dkt. 80, at 15–27.)

In determining whether plaintiffs are "similarly situated" to members of a proposed collective, "[c]ourts generally require 'that there be a factual nexus between the claims of the named plaintiff and those who have chosen or might potentially choose to opt[]in to the action.'" *Brown II*, 2018 WL 3105068, at *6 (alteration omitted) (quoting *Warman v. Am. Nat'l Standards Inst.*, 193 F. Supp. 3d 318, 323 (S.D.N.Y. 2016)). "The relevant issue is not whether the named plaintiff and potential opt-in plaintiffs are identical in all respects, but, rather, whether they all allegedly were subject to a common employment policy that violated the FLSA." *Warman*, 193 F. Supp. 3d at 323 (citing *Myers*, 624 F.3d at 555). At step one, Plaintiffs need only make "a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law," *Brown II*, 2018 WL 3105068, at *6 (quoting *Guillen v. Marshalls of MA, Inc.* ("*Guillen I*"), 750 F. Supp. 2d 469, 475 (S.D.N.Y. 2010)), or else a "modest plus" factual showing where "there has been substantial discovery," *id.* (citing *Korenblum*, 195 F. Supp. 3d at 481–82).

"Courts consistently hold that a showing of a common formal policy of exemption is insufficient on its own to certify a class action." *Stevens v. HMSHost Corp.*, No. 10-CV-3571 (ILG) (VVP), 2012 WL 13098466, at *5 (E.D.N.Y. June 15, 2012) (collecting cases); *see also Brown I*, 252 F. Supp. 3d at 263 ("[U]se of a common job description does not mean that conditional certification is *per se* warranted . . . ." (collecting cases)). Thus, "[P]laintiffs must show that they and other [ETLs] were similarly situated with respect to the claim that they were required to perform non-managerial job duties in contravention of the formal job description." *Amhaz v. Booking.com (USA), Inc.*, No. 17-CV-2120 (GBD) (HBP), 2018 WL 4279468, at *8

50

(S.D.N.Y. Aug. 23, 2018) (alterations omitted) (quoting *Guillen I*, 750 F. Supp. 2d at 476), *report and recommendation adopted*, No. 17-CV-2120 (GBD) (HBP), 2018 WL 4360791 (S.D.N.Y. Sept. 5, 2018). "Rather than rely on reasonable inferences, Plaintiffs must provide actual evidence of a factual nexus between their situation and the persons they claim are similarly situated." *Sharma v. Burberry Ltd.*, 52 F. Supp. 3d 443, 460 (E.D.N.Y. 2014) (internal quotations, citations, and alterations omitted). Where a defendant has a common national policy, the sworn statements of additional plaintiffs throughout the country can be sufficient to establish this "factual nexus" for the purposes of conditionally certifying a nationwide class. *See Stevens v. HMSHost Corp.*, No. 10-CV-3571 (ILG) (VVP), 2012 WL 13098466, at *5 (E.D.N.Y. June 15, 2012)[36]; *see also Amhaz*, 2018 WL 4279468, at *5 ("[I]t is well settled that personal experiences combined with observations of other potential opt-in plaintiffs are sufficient at the conditional certification stage." (collecting cases)); *Heitzenrater v. Officemax, Inc.*, No. 12-CV-900S, 2014 WL 448502, at *6 (W.D.N.Y. Feb. 4, 2014) ("[W]hile courts have refused to certify national collective actions based solely on an individual's deposition or even based on several geographically clustered plaintiffs' depositions, courts regularly conditionally certify collective actions where . . . evidence is presented from multiple employees from multiple locations nationwide." (quoting *Amador v.*

---

[36] Plaintiffs emphasize that, in *Stevens v. HMSHost Corp.*, the Honorable Viktor V. Pohorelsky, United States Magistrate Judge, granted step-one conditional certification to a nationwide FLSA collective comprised of defendant's exempt employees after plaintiffs "met their minimal burden of showing that they [we]re similarly situated to members of a nationwide class who . . . performed non-exempt work without overtime compensation." 2012 WL 13098466, at *4. The evidence before the *Stevens* court included "a Rule 30(b)(6) deposition of [defendant] and depositions of the named plaintiff and three opt-ins." *Stevens*, 2012 WL 13098466, at *2. Here, the evidence before the Court is similar and primarily consists of the sworn statements of Plaintiff Jibowu and seven opt-in Plaintiffs, Defendant's Rule 30(b)(6) deposition, and Defendant's additional evidence submitted in support of the Rule 30(b)(6) deposition testimony. (*See* Dkt. 80 and attachments (including instructions for and results of the ETL self-audits in 2016 and 2017); Dkt. 79 and attachments; Dkt. 100 and attachments.)

*Morgan Stanley & Co. LLC*, No. 11-CV-4326 (RJS), 2013 WL 494020, at *9 (S.D.N.Y. Feb. 7, 2013))); *Stevens*, 2012 WL 13098466, at *2 (noting that "a *de facto* [illegal] policy is demonstrated through a showing of the illegal application of a common legal policy – *i.e.* that employees nationwide who, though classified as exempt, nevertheless performed primarily non-exempt work" (citing *Jenkins v. TJX Cos. Inc.*, 853 F. Supp. 2d 317, 321 (E.D.N.Y. 2012))). Ultimately, "the real issue is whether the potential plaintiffs have submitted enough evidence demonstrating a de-facto illegal policy in contravention to a facially legal policy." *Ahmed v. T.J. Maxx Corp.*, No. 10-CV-3609 (ADS) (ETB), 2013 WL 2649544, at *13 (E.D.N.Y. June 8, 2013).

Thus, at step one, Plaintiffs must establish that Defendant applied a uniform national policy to all ETLs in the proposed collective and, as Plaintiffs do not allege that this policy is itself unlawful under the FLSA, must also proffer enough evidence to show that Defendant had a *de facto* unlawful policy of misclassifying these ETLs. There is no consensus in this Circuit on the precise type and quantity of evidence required for this inquiry. *Compare Brown I*, 252 F. Supp. 3d at 264 (denying step-one certification of nationwide collective where plaintiffs "fail[ed] to meaningfully describe the content of [defendant's] supposedly 'uniform policies and procedures' and explain how they relate to [p]laintiffs' claim that [managers] primarily perform non-exempt duties in contravention of the [manager] job description" (citing *Guillen I*, 750 F. Supp. 2d at 477–78)), *and Jenkins*, 853 F. Supp. 2d at 321 (denying conditional certification of nationwide collective where, other than his deposition, "[p]laintiff provide[d] no other affidavits, depositions, or even hearsay evidence that he was actually aware of other [managers] who also primarily performed non-exempt duties"), *with McEarchen v. Urb. Outfitters, Inc.*, No. 13-CV-3569 (FB) (JO), 2014 WL 2506251, at *2 (E.D.N.Y. June 3, 2014) (noting that a nationwide collective was properly conditionally certified where defendant "admit[ted] that all members of the putative

collective [we]re subject to a common [lawful] policy with respect to the FLSA's application"), *aff'd*, No. 13-CV-3569 (FB) (JO), 2014 WL 4701164 (E.D.N.Y. Sept. 23, 2014), *and Heitzenrater*, 2014 WL 448502, at *4 (conditionally certifying nationwide collective of managers where plaintiffs submitted "information regarding the standardized job description" for managers as well as evidence from fourteen opt-in plaintiffs from approximately twelve different states), *and Ravenell v. Avis Budget Car Rental, LLC*, No. 08-CV-2113 (SLT) (ALC), 2010 WL 2921508, at *3–4 (E.D.N.Y. July 19, 2010) (conditionally certifying nationwide collective where three named and seven opt-in plaintiffs, who worked at three national airports near two cities, submitted defendant's uniform national job description as well as depositions stating that they primarily engaged in non-managerial tasks).

Here, the Court finds that the evidence submitted by Plaintiffs is insufficient to show a *de facto* nationwide policy of misclassification in violation of the FLSA. While relying on Defendant's lawful ETL policies as demonstrating the uniformity of its practices across the country, Plaintiffs have submitted only eight sworn statements in approximately six states as to Defendant's purportedly unlawful unofficial policy.[37] Courts in this Circuit have generally denied certification of nationwide collectives where plaintiffs proffer evidence of *de facto* unlawful policies in only some of a defendant employer's many locations. *See, e.g.*, *Meo v. Lane Bryant, Inc.*, No. 18-CV-6360 (JMA) (AKT), 2019 WL 5157024, at *10 (E.D.N.Y. Sept. 30, 2019) (denying conditional certification of a nationwide collective where opt-in plaintiffs worked in or

---

[37] The Brewer Declaration states that, from June 28, 2014, to June 28, 2019, the opt-in Plaintiffs were assigned to work at nine Target stores in California, Louisiana, Ohio, Oklahoma, and Texas. (Brewer Decl., Dkt. 80-1, ¶ 30.) While the Court here includes Plaintiff Jibowu's employment at Defendant's Chicago and Brooklyn stores in Illinois and New York, respectively, the Court does not consider Engeran for the purposes of determining the scope of the collective, *see supra* note 28. The Court also does not include stores or states well outside of the relevant time period, e.g., opt-in Plaintiff Steckler's work at Target stores in Pennsylvania as early as 2001.

had knowledge of similarly situated employees in defendant's stores in only twelve states though defendant operated 727 stores across forty-seven states); *Brown v. AvalonBay Communities, Inc.*, No. 17-CV-6897 (AKT), 2019 WL 1507901, at *11 (E.D.N.Y. Mar. 29, 2019) (denying conditional certification of a nationwide collective where plaintiffs' evidence "indicate[d] application of the same unlawful policy at [defendant's] properties" in only six states); *Amhaz*, 2018 WL 4279468, at *8 (denying conditional certification of nationwide collective where the affidavits of managers in defendant's New York, Los Angeles and Las Vegas offices were insufficient to show that they were similarly situated to potential plaintiffs across the country); *Guillen v. Marshalls of MA, Inc.* ("*Guillen II*"), 841 F. Supp. 2d 797, 800 (S.D.N.Y. 2012) (denying nationwide conditional certification where plaintiff "provided no evidence [] that could plausibly lead to the inference that [managers] nationwide [were] performing non-exempt tasks" notwithstanding the testimonies of five employees in New York City stores), *adopted*, No. 09-CV-9575 (LAP) (GWG), 2012 WL 2588771 (S.D.N.Y. July 2, 2012). Here, the Court finds that the declarations of the eight opt-in Plaintiffs are insufficient to show that they are, in fact, similarly situated to the potential members of the proposed nationwide collective of more than 14,000 Target ETLs.[38] *See Sharma*, 52 F. Supp. 3d at 460 ("Rather than rely on reasonable inferences, Plaintiffs must provide actual evidence of a factual nexus between their situation and the persons they claim are similarly situated." (internal quotations, alterations, and citation omitted)); *see also Lin v. Everyday Beauty Amore Inc.*, No. 18-CV-729 (BMC), 2018 WL 6492741, at *3 (E.D.N.Y. Dec. 10, 2018) (noting that "when plaintiffs do not state any facts as to the existence of a common

---

[38] "Between June 28, 2014, and June 28, 2019, there were approximately 14,267 current and former ETLs working in the" ETL roles that comprise the proposed collective. (Brewer Decl., Dkt. 80-1, ¶ 6.)

policy or practice of underpayment at other store locations[,] a collective action should not include those stores . . . where store locations exist[] nationwide" (collecting cases)).

Additionally, Defendant attributes Plaintiffs' performance of primarily nonexempt work to Plaintiffs' "personal decisions or alleged practices of *local* management teams, explanations that cannot possibly be representative of thousands of other ETLs." (Def.'s Opp'n, Dkt. 80, at 19 (emphasis in original).) The Court agrees that misclassification due to variation in unofficial, *de facto* policies implemented at individual stores generally weighs against conditional certification of a nationwide collective.[39] *See Ahmed*, 2013 WL 2649544, at *14 ("Thus, because 'there may be vast differences in the practices of individual stores across the country,' the Court finds that the Plaintiff[s'] evidence is 'extremely thin' with respect to the existence of a nationwide de facto illegal policy so that conditional certification is simply not appropriate." (quoting *Guillen I*, 750 F. Supp. 2d at 476–78)). Here, the Court notes that Plaintiffs have not argued that there is no localized variation with respect to practices in Defendant's stores, nor have Plaintiffs addressed the discretion afforded to local managers at those stores. *Cf. Thornburn v. Door Pro Am. Inc.*, No. 16-CV-3839 (DRH) (AKT), 2018 WL 1413455, at *8 (E.D.N.Y. Mar. 20, 2018) (conditionally certifying nationwide collective where plaintiff plausibly showed the same unlawful compensation system for employees nationwide with no deviation in the system by location); *McEarchen*, 2014 WL 2506251, at *3 (noting that conditional certification of a nationwide collective was properly

---

[39] Defendant has submitted the results of ETL self-audits conducted in 2016 and 2017, in which the vast majority of ETLs reported spending 50% or more of their work time on managerial duties. (Brewer Decl., Dkt. 80-1, ¶¶ 23–24.) However, at this stage, the Court does not weigh the merits of the self-audit results, which purport to establish significantly localized variation in ETL duties, i.e., that "those ETLs who responded spending 50% or less of their work time on managerial duties were clustered among certain districts." (*Id.* ¶ 25.)

granted where, *inter alia*, defendant "ha[d] not taken the position . . . that the plaintiffs in this case engaged in non-exempt tasks due to the decisions of local managers").

However, the Court grants conditional certification of those ETLs in the proposed collective who were employed in the particular Target stores at which Plaintiffs have proffered firsthand evidence of Defendant's *de facto* policy of misclassification—specifically, the Target store locations at which Plaintiffs worked, even temporarily, from June 28, 2014, to June 28, 2019, in California, Illinois, New York, Ohio, Oklahoma, and Texas. Courts in this Circuit have regularly circumscribed FLSA collective actions in this manner. *See, e.g.*, *McDermott*, 2018 WL 1865916, at *6 (limiting proposed nationwide collective to those employees who worked pursuant to a particular master service agreement where plaintiffs had established only "that a sufficient factual nexus exist[ed]" as to those potential opt-in plaintiffs); *Amhaz*, 2018 WL 4279468, at *8 (limiting proposed nationwide collective to defendant's employees who worked in three offices in New York, Los Angeles, and Las Vegas); *cf. Anjum v. J.C. Penney Co., Inc.*, No. 13-CV-460 (RJD) (RER), 2015 WL 3603973, at *8 (E.D.N.Y. June 5, 2015) (limiting proposed statewide collective to employees of two stores where the court lacked "firsthand evidence of any violations at any of [defendant's other] retail stores" in New York).

## C.    Distribution of Notice

A district court has the authority to facilitate and "narrow[]" a FLSA opt-in notice such that it is directed towards the appropriate individuals that are the subject of the FLSA collective action. *See Glatt*, 811 F.3d at 540; *see also Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989) ("We hold that district courts have discretion, in appropriate cases, to implement 29 U.S.C. § 216(b) . . . by facilitating notice to potential plaintiffs."); *Myers*, 624 F.3d at 555 n.10 (applying the reasoning of *Hoffman-La Roche* to FLSA collective actions). A district court has

discretion to facilitate notice in order to "ensure that putative plaintiffs receive accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." *Bittencourt v. Berrara Bakery & Café, Inc.*, 310 F.R.D. 106, 116 (S.D.N.Y. 2015) (internal quotation and citation omitted). "The Court understands its discretion to be guided by the goals of the notice: to make as many potential plaintiffs as possible aware of this action and their right to opt in without devolving into a fishing expedition or imposing undue burdens on the defendants." *Guzelgurgenli v. Prime Time Specials Inc.*, 883 F. Supp. 2d 340, 356 (E.D.N.Y. 2012) (internal quotation and citation omitted).

Plaintiffs have submitted with their motion a proposed Notice and Consent Form (Dkt. 79-19), to which Defendant objects for several reasons. The Court discusses several of these objections below.

### 1.    Tolling the Limitations Period

Plaintiffs first request that the Court authorize notice to all members of the proposed collective who worked for Defendant up to three years prior to the filing of the Complaint—that is, from June 28, 2014 until June 28, 2017 (*see* Compl., Dkt. 1)—and that the Court accordingly toll the statute of limitations from the date of the filing of the Complaint until the date of this Order and/or the date on which Notice issues (Pls.' Mem., Dkt. 79-1, at 21). Defendant argues that the limitations period should not be tolled and that the notice cut-off date should be three years prior to the issuance of the Notice. (Def's. Opp'n, Dkt. 80, at 28.)

Willful violations of the FLSA are subject to a three-year statute of limitations. 29 U.S.C. § 255(a). "At the conditional certification stage, allegations of willful conduct are sufficient to apply the three-year statute of limitations for purposes of certifying the class." *Valerio v. RND Indus., LLC*, 314 F.R.D. 61, 73–74 (E.D.N.Y. 2016) (internal quotation and citations omitted).

The parties do not dispute that the three-year limitations period applies in this action. (*See* Pls.' Mem., Dkt. 79-1, at 21; Def's. Opp'n, Dkt. 80, at 28.) Typically, this limitations period is calculated from the date of the conditional certification order or issuance of notice, as the statute of limitations runs from the date a plaintiff files their written consent with the court. *See* 29 U.S.C. § 256(b); *see also Guzelgurgenli*, 883 F. Supp. 2d at 356–57 (noting the "general practice of setting [the limitations period] three years prior to the Court's approval of the notice").

However, in a FLSA conditional certification action, "a district court may toll the limitations period to avoid inequitable circumstances, giving due consideration to whether the plaintiffs have acted with reasonable diligence in pursuing their claims and whether the circumstances are extraordinary enough to warrant equitable relief." *Viriri*, 320 F.R.D. at 355 (alteration omitted) (quoting *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 170 (S.D.N.Y. 2014)); *see also McDermott v. Fed. Sav. Bank*, No. 14-CV-6657 (JMA) (GRB), 2018 WL 6718599, at *3 (E.D.N.Y. Sept. 28, 2018) ("[I]n determining whether to apply the doctrine of equitable tolling, a court must determine 'whether the person seeking application of the equitable tolling doctrine (1) has acted with reasonable diligence during the time period she seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply.'" (quoting *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 80, 80–81 (2d Cir. 2003), *as amended* (July 29, 2003))), *report and recommendation adopted*, No. 14-CV-6657 (JMA) (GRB), 2019 WL 1305992 (E.D.N.Y. Mar. 22, 2019). Courts most commonly toll the FLSA limitations period "where the defendant has concealed the existence of a cause of action from the plaintiffs." *Mark v. Gawker Media LLC*, No. 13-CV-4347 (AJN), 2014 WL 5557489, at *2 (S.D.N.Y. Nov. 3, 2014) (collecting cases). Courts may also permit tolling of the limitations period "during the period the court takes to decide the conditional certification motion." *Viriri*, 320 F.R.D. at 355 (collecting cases).

As an initial matter, the Court permits tolling of the limitations period for the time during which this motion has been pending. Plaintiffs filed their motion for conditional certification on September 6, 2019 (*see generally* Dkt. 79), and the Court is persuaded that equitable tolling is warranted for the intervening time, now more than a year. "[T]hose whose putative class representatives and their counsel are diligently and timely pursuing the claims should [] not be penalized due to the courts' heavy dockets and understandable delays in rulings." *McGlone v. Contract Callers, Inc.*, 867 F. Supp. 2d 438, 445 (S.D.N.Y. 2012).

Plaintiff argues that the Court should also equitably toll this action from June 28, 2017, the date of the filing of the Complaint, in light of "Defendants' obstructive course of action in this litigation . . . regarding, for instance, the location of the opt-in depositions[] [and] Target's overreaching discovery requests." (Pls.' Mem., Dkt. 79-1, at 21.) Defendant maintains that "issuing notice to ETLs dating back to June 28, 2014[] 'would serve no useful purpose as any FLSA claims they might have had are now time-barred'" (Def.'s Mem., Dkt. 80, at 28 (quoting *Doucoure v. Matlyn Food, Inc.*, 554 F. Supp. 2d 369, 373 n.4 (E.D.N.Y. 2008))), and that "equitable tolling applies only in [] rare and exceptional circumstance[s]" (*id.* at 29 (alteration omitted) (quoting *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000))).

"[A] number of cases in this Circuit have found that[,] at the time of [FLSA] conditional certification, the Court should err on the side of caution and set the time for notice using the date of the filing of the lawsuit." *Luo v. Panarium Kissena Inc.*, No. 15-CV-3642 (WFK) (ST), 2016 WL 11263668, at *13 (E.D.N.Y. Nov. 23, 2016) (collecting cases); *accord Valerio*, 314 F.R.D. at 74 ("[C]ourts frequently permit notice to be keyed to the three-year period prior to the filing of the complaint, with the understanding that challenges to the timeliness of individual plaintiffs' actions will be entertained at a later date." (internal quotation and citations omitted)); *see also Whitehorn*

*v. Wolfgang's Steakhouse, Inc.*, 767 F. Supp. 2d 445, 451 (S.D.N.Y. 2011) (finding that, where "equitable tolling may extend the statute of limitations for certain prospective plaintiffs[,] [] it is appropriate for notice to be sent to the larger class of prospective members, with the understanding that challenges to the timeliness of individual plaintiffs' actions will be entertained at a later date").

As discussed *supra* in the Court's review of the procedural history of this matter, Judge Pollak resolved a series of discovery disputes between the parties. The Court recognizes that some of these discovery disputes pertained to Defendant's summary judgment motion and not Plaintiff's motion for conditional certification. Accordingly, in light of relevant precedent, the protracted discovery proceedings, and the fact that the parties were also simultaneously conducting discovery for—and engaging in discovery disputes with regard to—Defendant's summary judgment motion, the Court finds that equitable tolling is warranted in this instance. More than two years elapsed between the filing of the Complaint on June 28, 2017 and Plaintiffs' September 6, 2019 motion for conditional certification, and more than a year has elapsed between the filing of the conditional certification motion and this Order. Because the FLSA claims of some prospective plaintiffs will, indeed, still likely be time-barred, the Court finds it all the more appropriate that "challenges to the timeliness of individual plaintiffs' actions will be entertained at a later date" rather than blanketly denied at this stage. *Whitehorn*, 767 F. Supp. 2d at 451.

Accordingly, the Court finds that the notice period should run from June 28, 2014 until the date on which Notice issues, and that the statute of limitations should be tolled from June 28, 2017, the date on which the Complaint was filed.

### 2. Contact Information

Plaintiffs request that the Court order Defendant "to produce a computer-readable list of the names, last known mailing addresses, last known telephone numbers, last known email

addresses, dates of work, and work locations for all Collective Members, and the Social Security numbers of those Collective Members whose notices are returned undeliverable." (Pls.' Mem., Dkt. 79-1, at 22.) Defendant argues, *inter alia*, that Plaintiff "intrudes upon the privacy of potential collective members by requesting Social Security numbers." (Def.'s Mem., Dkt. 80, at 29–30.) Plaintiffs do not address this matter in their reply. (*See generally* Pls.' Reply, Dkt. 91.)

"Many courts have determined that discovery of contact information is appropriate at the notice stage in FLSA collective actions." *Chui v. Am. Yuexianggui of LI LLC*, No. 18-CV-5091 (SJF) (AKT), 2020 WL 3618892, at *12 (July 2, 2020) (internal quotation omitted). "In regard to requests for names, last known addresses, telephone numbers (both home and mobile), e-mail addresses, and date of employment, courts often grant this kind of request in connection with a conditional certification of an FLSA collective action." *Puglisi v. TD Bank, N.A.*, 998 F. Supp. 2d 95, 102 (E.D.N.Y. 2014) (internal quotation and citations). However, requests for certain types of contact information will be deemed "overly broad for the purposes of providing notice to potential FLSA opt-in plaintiffs." *Rotari v. Mitoushi Sushi, Inc.*, 448 F. Supp. 3d 246, 255 (E.D.N.Y. 2020) (reaching this conclusion where plaintiffs sought "a computer-readable list of names, last known addresses, telephone numbers, e-mail addresses, social security numbers, dates of employment, titles, compensation rates, and hours worked per week"); *see also In re Penthouse Exec. Club Comp. Litig.*, No. 10-CV-1145 (NRB), 2010 WL 4340255, at *5 (S.D.N.Y. Oct. 27, 2010) (permitting discovery of telephone numbers but denying plaintiffs' request for social security numbers or home addresses of putative class members) (collecting cases).

The Court finds here that Plaintiffs' request is overbroad and directs Plaintiffs to modify the requested contact information so as not to include last known mailing addresses or the social security numbers of prospective plaintiffs whose notices are returned as undeliverable.

### 3.    Other Issues

Defendant maintains that the Proposed Notice suffers from additional deficiencies—e.g., that it "is misleading because it does not contain sufficient language expressing [Defendant]'s position" and "uses inappropriate text message and/or email notification[]." (Def.'s Opp'n, Dkt. 80, at 30.) Defendant requests that the parties be required to meet and confer about the Proposed Notice before it is issued. The Court agrees and directs the parties to engage in an immediate good faith meet-and-confer and submit a proposed Revised Proposed Notice within thirty (30) days of this Order. Should any objections remain after the meet-and-confer, the Court directs counsel to submit a redline version of the Revised Proposed Notice for review and determination by the Court.

\*        \*        \*

The Court accordingly grants conditional certification of a FLSA collective action comprised of the following:

> current and former Food ETLs, Sales Floor ETLs, Softlines ETLs, Hardlines ETLs, Guest Experience ETLs, Replenishment ETLs, and Logistics ETLs in stores that do not have Replenishment ETLS, employed by Defendants at the Target store locations within California, Illinois, New York, Ohio, Oklahoma, Pennsylvania, and Texas, at which Plaintiff Jibowu or the opt-in Plaintiffs worked, at any time from June 28, 2014 to the present.

### CONCLUSION

For the reasons discussed above, Defendant's motion for summary judgment is denied, except as to Plaintiff Jibowu's IWPCA claim, which is dismissed with prejudice. Plaintiffs' motion for conditional certification as a collective action under the FLSA, pursuant to Section 216(b), is granted, subject to the limitations set forth in this Memorandum and Order. The parties are directed to meet and confer in good faith and to submit a Revised Proposed Notice and Consent

to Join form within thirty (30) days of the date of this Order that complies with the directives set forth herein.

SO ORDERED.

/s/ Pamela K. Chen
_____
Pamela K. Chen
United States District Judge

Dated: September 30, 2020
      Brooklyn, New York